**The STATE OF MINNESOTA, the State of North Dakota, State of South Dakota et al., State of Wisconsin, City of St. Paul, the Housing and Redevelopment Authority in and for the City of Minneapolis, Minnesota, Independent School District #625 of the City of St. Paul, Minnesota, and Housing and Redevelopment Authority of the City of St. Paul, Minnesota, Plaintiffs,**

**v.**

**UNITED STATES STEEL CORPORATION, Paper, Calmenson & Co., St. Paul Foundry & Manufacturing Co., (now the Maxson Corporation), St. Paul Structural Steel Company, Crown Iron Works Company, and the Hustad Company, Defendants.**

**Nos. 4-68 Civ. 37, 4-68 Civ. 36, 4-68 Civ. 38, 4-68 Civ. 41, 3-68 Civ. 34, 3-68 Civ. 36, 3-68 Civ. 37 and 3-68 Civ. 39.**

United States District Court
D. Minnesota,
Third Division.

May 17, 1968.

Erickson, Popham, Haik & Schnobrich, by Wayne G. Popham and Bruce D. Willis, Minneapolis, Minn., and Roger E. Montgomery, Special Asst. Atty. Gen., St. Paul, Minn., for plaintiff State of Minnesota.

Erickson, Popham, Haik & Schnobrich, by Wayne G. Popham, Minneapolis, Minn., Paul M. Sand, First Asst. Atty. Gen., Bismarck, N. D., and Robert A. Alphson, Special Asst. Atty. Gen., Grand Forks, N. D., for plaintiff State of North Dakota.

Erickson, Popham, Haik & Schnobrich, by Wayne G. Popham, Minneapolis, Minn., and John B. Wehde, Special Asst. Atty. Gen., Pierre, S. D., for plaintiff State of South Dakota, et al.

George F. Sieker and Theodore L. Priebe, Asst. Attys. Gen., Madison, Wis., for plaintiff State of Wisconsin.

O'Connor, Green, Thomas, Walters & Kelly, by Thomas A. Keller, III, Minne-

apolis, Minn., and H. Robert Halper, Washington, D. C., for plaintiffs the Housing and Redevelopment Authority in and for the City of Minneapolis, Minnesota, Independent School District #625 of the City of St. Paul, Minnesota, the Housing and Redevelopment Authority in and for the City of St. Paul, Minnesota, and in addition Kenneth J. Fitzpatrick, Asst. Corp. Counsel, for the City of St. Paul.

Briggs & Morgan, by David W. Raudenbush, John R. Friedman, St. Paul, Minn., and D. B. King, Pittsburgh, Pa., for defendant United States Steel Corporation.

Doherty, Rumble & Butler, by Frank M. Claybourne, Eugene M. Warlich and Ralph K. Morris, St. Paul, Minn., for defendant Paper, Calmenson & Co.

Moore, Costello & Hart, by Robert A. Albrecht, St. Paul, Minn., for defendant St. Paul Foundry & Manufacturing (now The Maxson Corporation).

Fredrikson, Byron & Colburn, by Jerome B. Pederson, Minneapolis, Minn., for defendant St. Paul Structural Steel Co.

Oscar A. Brecke and J. Robert Nygren, Minneapolis, Minn., appeared for Crown Iron Works.

Warner, Ratelle, Hennessy, Vander-Vort & Stasel, by Frank J. Warner, Minneapolis, Minn., for defendant The Hustad Co.

## JOINT PRETRIAL ORDER

NEVILLE, District Judge.

Before the court are eight separate civil treble damage suits bottomed on the antitrust laws, brought by eight different governmental entities against six steel companies. The City of St. Paul, Minnesota, commenced its action on February 1, 1968, by filing a complaint in the Third Division of the District of Minnesota. Thereafter, the Housing and Redevelopment Authority for the City of Minneapolis, Independent School District #625 of the City of St. Paul and the Housing and Redevelopment Authority of the City of St. Paul, filed separate independent complaints, the first two on February 6 and the latter on February 8, 1968. These four suits were brought in the Third Division of this district and will be referred to as "Third Division cases." Common counsel represent these several plaintiffs.

Four other plaintiffs, the State of Minnesota, the State of North Dakota, the State of South Dakota and the State of Wisconsin commenced separate actions in the Fourth Division of this court, the first three on February 8, 1968, and the State of Wisconsin on February 9, 1968. These four "Fourth Division cases" were transferred to the Third Division pursuant to an order of this court to the end that all eight cases might be considered together to expedite and economize as to pretrial measures.

All eight actions name the same six structural steel fabricating companies above as defendants.[1] Plaintiffs seek treble damages from the defendants under the Sherman and Clayton Acts allegedly for conspiring in restraint of interstate trade and commerce affecting the structural steel fabricating industry. The defendants are claimed to have conspired to fix prices, unduly inflating the same and rendering them non-competitive, and further are claimed to have allocated contracts and business among themselves.

These private civil suits follow in the wake of a previous investigation by the United States Department of Justice of the structural steel fabricating industry and the institution by the government of criminal action under the antitrust laws. On February 10, 1964, these same six defendants were indicted by the grand jury for the District of Minnesota. The criminal action was terminated on

1. Although the original complaints named St. Paul Foundry & Manufacturing Company as a defendant, its name has recently been changed and by stipulation the name The Maxson Corporation has been substituted therefor.

September 16, 1964, by entry of judgments of conviction of each of the defendants following *nolo contendere* pleas. The private plaintiffs allege violations of the antitrust laws substantially identical to those charged in the indictment.

At the institution of each of the above actions, the court entered a separate preliminary order in the form contained in the Recommended Procedures for Protracted Cases (adopted by the Judicial Conference 1960), fixing a joint preliminary informal pretrial conference for March 15, 1968 and temporarily enjoining discovery and other proceedings. At that pretrial conference, a number of questions were raised and at the court's suggestion briefs were requested and argument set for a continued date of April 15, 1968. The court is satisfied that the eight cases portend protracted litigation and, at least until some clear showing to the contrary is made, should be treated jointly as such under the aforesaid Recommended Procedures.

The court now has before it nine different motions brought by the various parties:

I. To determine whether or not the several actions are entitled to treatment as class actions under Rule 23 of the Federal Rules of Civil Procedure.

II. To disqualify one of plaintiffs' counsel and, since he is admitted to the bar elsewhere and not in Minnesota, to refuse his admittance to this court for the purpose of presenting and participating in these law suits; and requiring answers of witnesses to certain questions in deposition proceedings related to this question.

III. To permit intervention as a party plaintiff by the Metropolitan Airports Commission.

IV. To permit plaintiffs access to the list of grand jury witnesses and subpoenas.

V. To vacate a previous order by a judge of this court dated July 16, 1964, sealing or withholding from the public record certain documents in the criminal antitrust proceedings.

VI. To consolidate the Third Division cases.

VII. To lift the present order placing restraint on discovery proceedings so as to permit the serving of interrogatories and prescribing a schedule for discovery proceedings.

VIII. To permit defendants an extension of time to answer plaintiffs' complaints.

IX. To strike certain allegations from plaintiffs' complaints which refer to the previous criminal proceedings.

These motions will be considered seriatim, the first being perhaps both the most important and the most complicated.

## I.

## TREATMENT AS CLASS ACTIONS UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Each plaintiff seeks to maintain its suit as a class action and has moved this court for an order under Rule 23[2] of the Federal Rules of Civil Procedure declaring it to be the representative of a large group of absentee plaintiffs. Each State plaintiff in the Fourth Division cases seeks to represent the governmental entities and units within such State.[3] The Third Division plaintiffs

2. Rule 23 of the Fed.R.Civ.P. was amended effective July 1, 1966 and as so amended is applicable to this case. It is lengthy and quotation in full seems unnecessary.

3. The State of Minnesota seeks to represent itself and:
"the class consisting of all cities, counties, school districts, municipal and public corporations, political subdivisions,

also each purport to represent classes composed of governmental agencies and entities.[4] Thus, the present parties' classes substantially overlap and conflict in that they presume to represent many of the same governmental entities.

Defendants have cross-motioned, contending that none of these plaintiffs can maintain its suit as a class action under Rule 23. Defendants concede that the four State plaintiffs would adequately represent the lesser governmental entities within the classes, but submit that other Rule 23 criteria are unfulfilled; namely, that the State of Minnesota suit does not meet the requirements of 23 (a) (3) and (b) (3), and the suits of the States of North Dakota, South Dakota and Wisconsin are not within 23(a) (1), (a) (3), and (b) (3).[5] The latter objections are also raised with respect to the Third Division plaintiffs, and, additionally, it is submitted that the Third Division plaintiffs would not adequately represent the purported class or classes as required by 23(a) (4).

Finally, the defendants earnestly urge the court to find that none of these suits is properly a class action since the absentee members of the classes are barred by the statute of limitations provided by Section 5(b) of the Clayton Act.[6] In-

educational institutions, and all other public agencies and entities within the State of Minnesota, supported in whole or in part by state or local government funds, which have, in the course of their operations, purchased structural steel products from one or more of the defendants or co-conspirators during the period covered by this complaint."

The State of Wisconsin seeks to represent itself and:

"the class of all cities, counties, school districts, municipal and public corporations, political subdivisions and public agencies of Wisconsin * * *."

The State of North Dakota seeks to represent itself and the same class of entities alleged by the State of Minnesota, differing only in that the class is within the State of North Dakota.

The State of South Dakota seeks to represent: (1) itself; (2) all counties individually enumerated as parties plaintiff; (3) a class consisting of school districts, Boards of Education and political subdivisions which support school districts; and (4) tax-supported municipalities.

4. The Third Division plaintiffs seek to represent the class or classes consisting of the following:

"(a) all state, county, municipal and other governments and other political or governmental subdivisions or districts, and all governmental or public corporations, agencies, departments, boards, institutions, and other bodies * * * which are located or which operated within the Complaint Area;

(b) all governmental purchasers which are located or which operated within the State of Minnesota; or

(c) all governmental purchasers which are located or which operated within the Complaint Area, other than those state agencies represented in related actions filed against defendants by the respective Attorneys General of the States of Minnesota, Wisconsin, South Dakota and North Dakota * * *."

5. Rule 23 requires that the terms of (b) (3) be fulfilled in addition to the elements of (a) (1)–(4) if suits of this nature are to be maintained as class actions.

6. The Clayton Act provides in § 5(b):

"Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however*, That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

Section 5(b), 38 Stat. 731, as amended, 15 U.S.C. § 16(b) (1964 ed.).

asmuch as these suits were filed far more than one year after termination of the government's criminal proceedings, the four-year clause clearly provides the pertinent standard.[7] Defendants' argument is that any possible fraudulent concealment was eliminated and revealed as a matter of law on February 10, 1964, by the return of the grand jury indictment,[8] and that only the present eight plaintiffs filed their claims within four years of the known accrual of the claims and hence within the period of the applicable four year statute of limitations. Thus, defendants argue that all absentee class members are barred from the action (assuming no violative acts were committed after the return of the indictment) and that notice under Rule 23 need not issue. Plaintiffs oppose this suggestion, contending that the filing of their claims as class actions tolls the running of the statute of limitations as to absentee members of the classes with the same force and effect as though each member of the class, on or before February 10, 1968, had instituted and filed its own lawsuit.

The court holds and orders that all of these suits may be maintained as class actions and that the filing of these actions tolls the statute of limitations as to absentee plaintiffs, or, put another way, those eligible entities who chose to join the class in the manner hereinafter prescribed may date themselves back for purposes of the statute of limitations to the date of the filing of the class action which they join.

*The Prospective Members of the Classes are Sufficiently Numerous to Make Joinder Impracticable—Rule 23(a) (1).*

Under Rule 23(a) (1) the first prerequisite for maintaining a class action is that the class be sufficiently numerous so that joinder of all members is impracticable. Defendants admit that the State of Minnesota alleges a class sufficiently numerous to satisfy 23(a) (1).[9] Defendants urge the court to defer ruling on whether joinder is impracticable with the States of North Dakota, South Dakota and Wisconsin. The court is of a contrary view, however, and is satisfied that 23(a) (1) is fulfilled at this point in the case with respect to these latter State plaintiffs, which have alleged by affidavit sufficiently numerous absentee class members[10] to make

7. See Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 571 (10th Cir. 1961), petition for cert. dismissed, Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962); United Shoe Mach. Corp. v. International Shoe Mach. Co., 275 F.2d 459 (1st Cir. 1960); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 274 F.2d 608 (2d Cir. 1960).

8. By resolving the question whether the limitation period is tolled by commencement of a class action under 23(b) (3) against the defendants' position, the court need not answer the disputed question of whether as a matter of law the return of the indictment ended any fraudulent concealment. Since, by virtue of the tolling effect, all class members are within the statutory time period unless individual knowledge prior to the indictment date is shown, no absentee plaintiff is prejudiced by the assumption *arguendo* that the indictment eliminated fraudulent concealment. See State of Michigan v. Morton Salt Co., 259 F.Supp. 35, 45 (D. Minn.1966), aff'd sub nom. Hardy Salt Co. v. State of Illinois, 377 F.2d 768 (8th Cir.), cert. denied, 389 U.S. 912, 88 S.Ct. 238, 19 L.Ed.2d 260 (1967).

9. By affidavit, Minnesota states that it represents approximately 852 municipalities, 87 counties, 500 school districts and a number of other educational institutions and special governmental districts and entities.

10. By affidavit, it appears that the State of North Dakota represents approximately 149 municipalities, 52 counties, 498 school districts and 5 special governmental districts.
By affidavit, South Dakota represents approximately 600 municipalities, 67 counties, 500 school districts and several special governmental districts.
By affidavit, Wisconsin represents 72 counties, 184 cities, 383 villages, approxi-

joinder impracticable. If, at a later date, the posture of these actions becomes such that joinder or another alternative is practicable, the court may well then invoke its management discretion reserved by 23(c) (1), (c) (4), and 23(d). Whether the class action status continues somewhat depends upon the response to notice given pursuant to this order. Furthermore (without resolving the "overlap" problem for the moment), the Third Division cases also meet the requirements of 23(a) (1). In all of these eight cases, problems of management and administration would be rendered extremely cumbersome and difficult by joinder of all absentee members, service of separate pleadings, entry of a separate order as to each joiner, etc. Joinder would tend to result in great multiplicity, one of the major evils Rule 23 procedures seek to prevent.

*There are Questions of Law and Fact Common to the Classes—Rule 23(a) (2)*

Defendants concede that plaintiffs' actions involve questions common to the classes or members of the classes. Certainly it is clear that the existence or non-existence of a conspiracy, the territorial effect thereof and the impact on prices, pricing policies and competitive practices and perhaps other questions, are common to all members of the class. If there be no proof of a conspiracy, no one recovers in the eight different cases under the theory of the various pleadings. The establishment of a conspiracy and its effect is thus common to all claims of all members of the classes.

*The Claims of the Eight Representative Parties Plaintiff are Typical of the Claims of the Classes—Rule 23(a) (3).*

While the defendants concede that the plaintiffs' actions involve questions of law and fact common to the classes, they nevertheless controvert the allegations that such claims are "typical" of the claims of the absentee members as required by 23(a) (3). The court finds, however, that the present representatives press claims typical of those held by the members of the classes. While there may be some doubt regarding the precise meaning of 23(a) (3),[11] the courts looking at this question generally have required that the claims of the representatives of the class be co-extensive with the claims of the members of the class. See Eisen v. Carlisle & Jacquelin, 391 F.2d 555, Docket No. 30934 (2d Cir., filed Mar. 8, 1968), rev'g, 41 F.R.D. 147 (S.D.N.Y.1966); State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391, Civil No. 7-1932-C-2 (S.D.Iowa, filed Mar. 14, 1968); Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, Civil No. 41734 (E.D.Pa., filed Jan. 23, 1968); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967).

Defendants argue that the plaintiffs' claims are neither typical nor co-extensive in that all plaintiffs have sustained substantially different damages requiring extensive proof because of diverse methods of procuring and purchasing fabricated steel products. But all claims in the classes herein will require proof of a conspiracy, plus a showing of price fixing, allocation of business or other noncompetitive activity, as well as evidence of purchases at allegedly inflated prices.[12]

mately 572 school districts of several types, 1,124 towns and 755 special districts, such as metropolitan sewerage and drainage districts.

11. See 2 Barron & Holtzoff, Federal Practice and Procedure § 562 n. 3 (Wright ed., Supp.1966).

12. Each plaintiff, absentee and present, will probably also be required to prove fraudulent concealment virtually up to the time of the indictment. Such requires proof of two elements: (1) Use of fraudulent means by party raising the ban of the statute and (2) Successful concealment. Kansas City, Mo. v. Federal

Although each plaintiff will have to prove a precise purchase or purchases to show damages, the former two elements of proof will redound to the benefit of the entire class of claimants, and the court therefore is disposed to reject the defendants' theory. While a disparity of damages may be argued to go to the question of "predominance", see School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa. 1967), such disparate proof fails to make the representatives' claims atypical, especially in light of the positions taken by the above cited decisions. Since the representative parties need prove a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical. Moreover, if the "typical" requirement of 23(a) (3) is thought to mean only a lack of adversity between the representatives and the absentee plaintiffs, there is no showing of adverse interests in these actions which would militate against class action treatment.

*The Representative Parties Will Fairly and Adequately Protect and Represent the Interests of the Classes—Rule 23(a) (4).*

Defendants concede that the State plaintiffs fairly and adequately represent their classes of lesser governmental entities, but submit that the four Third Division plaintiffs fail adequately to represent their classes. The Third Division plaintiffs, on the other hand, already acting through common counsel, have sought to consolidate their respective actions,[13] and also ask that leave be granted to the Metropolitan Airport Commission to intervene as an additional party plaintiff in the consolidated suit.[14]

Irrespective of consolidation, 23(a) (4) is satisfied by the Third Division plaintiffs. In Eisen v. Carlisle & Jacquelin, supra, the only circuit court decision passing upon amended Rule 23 in this context, the court reversed the district court, holding *inter alia* that a plaintiff having merely $70 at stake in the litigation can fairly and adequately represent a class of all "odd-lot" traders on the New York Stock Exchange, whose total number approached 3,750,000 during the period of inquiry. Other courts under both the old and new rules have reached similar results although admittedly upon facts less exaggerated than *Eisen*.[15]

In view of the court's decision on the "overlap" problem hereinafter, further discussion is of no value on this question. It is to be noted though that chief counsel for the Third Division plaintiffs is an experienced antitrust lawyer, having only recently left the Antitrust Division of the

Pac. Elec. Co., 310 F.2d 271 (8th Cir. 1962), cert. denied, 371 U.S. 912, 83 S. Ct. 256, 9 L.Ed.2d 171. Certainly proof of the first element, if not also the second, is typical of the claims of the various members of the classes.

13. The Third Division plaintiffs' motions to consolidate the pretrial aspects of this litigation is granted as hereinbelow and a like ruling is tentatively made on the trial aspects pursuant to Rule 42 of the Federal Rules of Civil Procedure. Defendants have alleged no prejudice and this order should result in greatly decreased multiplicity of pretrial problems, administration and management difficulties.

14. The Metropolitan Airport Commission's motion for leave to intervene in the Third Division case as consolidated is granted under Rule 24(b) (2) of the Federal Rules of Civil Procedure as hereinbelow set forth. The statute of limitations provides no bar in light of the disposition with regard thereto, plus the intervenor's membership in any event in the class alleged by the Third Division complaint.

15. See, e. g., Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, Civil No. 41734 (E.D.Pa., Jan. 23, 1968) (ten plaintiffs representing large class of governmental entities); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967) (five franchisees on behalf of 650 others nationwide); City of Chicago v. Allen Bradley Co., 32 F.R.D. 448 (N.D.Ill.1963) (one city representing injured municipalities nationwide).

Department of Justice. He represents the second largest city in Minnesota, a large school district, two significant housing authorities, and now the Metropolitan Airport Commission. It is apparent that his representation will be fair, adequate and prosecuted with vigor.

Defendants further argue that the Third Division plaintiffs cannot represent any class because as required by local law they have not been authorized to do so. The court rejects this theory and agrees with the court in *Union Asphalt*, supra, which held that Rule 23 controls the determination of whether representation is adequate. Since Rule 23 does not look to state law, state law is irrelevant in making a Rule 23 determination. Although some courts have made an excursion into state law under similar facts,[16] this court believes the result depends only upon the criteria specified by Rule 23. Thus, since that criteria is otherwise satisfied by the Third Division suit herein, the suit may be maintained under Rule 23 and fulfills the scope and purport of 23(a) (4). As a practical matter, the court hereinafter in connection with the notice provision of 23(c) (2) is requiring that each member who wishes to join the class must furnish a certified resolution of authorization at that time.[17]

*Rule 23(b) (1) and (2).*

Plaintiffs by their pleadings do not purport to fall within, and thus no substantial objection to the class action has been made on the basis of, Rule 23(b) (1) (A) and (B), nor 23(b) (2). Rule 23(b) (1) (A) if it has any significance in this case clearly advances a reason for declaring a class action here, for if multiple suits were tried before different juries, "inconsistent or varying adjudications" might well result. Plaintiffs do claim, however, to fall under Rule 23(b) (3).

*Rule 23(b) (3).*

*Common Questions of Law and Fact Predominate and Class Action Treatment is Superior to Other Available Methods for a Fair and Efficient Adjudication of the Controversy.*

While extremely numerous absentees comprise the classes [18] in this case, and thus ultimately proof of many separate purchase transactions will be required to establish the damages (if any there be) of each class member, the larger issue undoubtedly will involve the alleged conspiratorial conduct between the six defendants and conceivably other co-conspirators. Defendants contend that a "meeting" type conspiracy in what they claim to be a nonoligopolistic industry which results in price fixing and business allocation as alleged by plaintiffs requires relatively little quantum of proof, and that the numerous damage elements "raise a myriad of particularized and complex questions of law amidst highly individualized factual settings." (Brief of defendants, p. 30.) Moreover, since fraudulent concealment is in issue with respect to each governmental entity, absent and present, the individual questions it is said cumulatively will far overshad-

16. See, e. g., State of Illinois v. Brunswick Corp., 32 F.R.D. 453 (N.D.Ill. 1963).

17. As rather a collateral matter, defendants have noted that in the South Dakota action, the various counties are joined and named as parties plaintiff. Defendants question whether the Attorney General has authority to represent the counties, absent a showing of direct authority by resolution of the various county boards or some other appropriate type of direct authorization. The court deems this question immaterial and holds that if there is any merit to this objection at all, it is obviated by the fact that clearly the counties will qualify as members of the class represented in the South Dakota action. If counsel desires to propose an amendment to the South Dakota pleading to cure his wording in this regard, such may be noticed and brought on for hearing at the next pretrial conference in this case.

18. See notes 9 and 10, supra.

ow any common questions of law and fact.[19] Plaintiffs, on the other hand, argue that the conspiracy proof, as the crux of the case, clearly will predominate over the lesser questions of damages and concealment. Ironically plaintiffs argue that the case presents difficult and lengthy problems regarding proof of conspiracy, while defendants submit that proof of the conspiracy aspect is minimal in relation to other aspects. In partial disregard of the arguments of each, the court finds in favor of the maintenance of the class action.

In determining "predominance," defendants attempt to establish as a test the total amount of time which will be spent on proof of the common issue of conspiracy in a class action compared to time spent on individual damage and fraudulent concealment proof in the trial of the same class action. They thus argue that the question of conspiracy does not predominate. If this be the correct approach to the question, arguably it is true that as a class action more time in toto will be spent in proof of individual damage claims in any of the class actions than will be spent in proof of conspiracy. Following defendants' line of reasoning, it would seem, however, that the situation should be considered and compared to that which would exist were no class action to be allowed. So for instance, if there were to be but a single case for trial, the court would expect that the great bulk of the time of that trial would be consumed with proof or the attempted proof of the existence and effect of a conspiracy and that the fraudulent concealment and damage issues would be far less predominant in the sense of time consumed at the trial. Were there to be 500 separate suits, this same pattern undoubtedly would prevail as to each. It seems specious and begging the question to say that if these 500 law suits were brought into a class so that proof on the issues of conspiracy need be adduced only once and the result then becomes binding on all 500, that thereby the common issue of conspiracy no longer predominates because from a total time standpoint, cumulatively individual damage proof will take longer. Of course, if defendants are upheld in their current posture of denying any conspiracy, then this is clearly the only issue that ever will be tried and certainly it cannot then be gainsayed but that such is the predominant question.

Under amended Rule 23, courts apparently were not required to make a finding that the common questions of law and fact predominated over purely individual questions.[20] Moreover, the Rules Advisory Committee shed little light on this problem in its Note to amended Rule 23, when it said such issues "may or may not" predominate in antitrust litigation.[21] Thus, there is little authority regarding the concept of predominance under 23(b) (3). Such authority as there is, however, indicates that the common questions of law and fact in the matter at bar sufficiently predominate, permitting maintenance of class actions.

In Eisen v. Carlisle & Jacquelin, 391 F.2d 555, No. 30934 (2d Cir., filed Mar. 8, 1968), plaintiff brought suit against the two largest "odd-lot" dealers of the New York Stock Exchange, alleging a conspiracy to monopolize odd-lot trading and charge excessive brokerage fees in

19. In fact, since fraudulent concealment proof will in large part probably consist of the same evidence of attempts to conceal, secrete and otherwise hide the fact of the conspiracy (if such there was), the common questions here will likely predominate on this phase of the doctrine of fraudulent concealment over the individual questions of when each plaintiff learned of the conspiracy.

20. Old Rule 23(a) (3) providing for the spurious class action merely required "*a* common question of law or fact affecting the several rights" of the class members.

21. Advisory Committee's Notes, Proposed Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966).

violation of the Sherman Act. Plaintiff sought to represent all odd-lot traders (approximately 3,750,000) under 23(b) (3), contending that these traders had been injured by an illegal "odd-lot differential" charged for odd-lot transactions on the Exchange. The district court had held that Rule 23(b) (3) treatment was improper, for, among other reasons, the questions of law and fact common to the class (i. e., the conspiracy) would not predominate as required by 23(b) (3). On appeal, the court reversed, holding that 23(b) (3) was fulfilled. The court found that the conspiracy question common to all traders would predominate, even though the damage issue as to each absentee member would require separate proof and calculation. In noting that the absentee and representative plaintiffs would mutually share proof of a conspiracy, the court stressed that 23(b) (3) requires liberal interpretation to avoid frustrating its purpose of encouraging the prosecution of claims too small to permit of otherwise ordinary independent vindication. The rationale regarding predominance was framed in the following language:

> "We realize that members of the proposed class might have had different motives when they entered into the odd-lot market. We are also mindful of the fact that there may be a wide variety of orders some of which may require special handling by the odd-lot dealer. Nevertheless, the alleged underlying conspiracy does contain a so-called 'common nucleus of operative facts.' Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967). All of these differences among the class members bear only on the computation of damages, a factor which, by itself, does not justify dismissal of the class action. Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y. 1966); City of Philadelphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa. 1965). Potential rivalry between class members after an initial finding of liability can be adequately handled since the rule gives a court the power to divide the class into appropriate subclasses or to require the members to bring individual suits for damages. Fed.R.Civ.P. 23(c) (4); Advisory Committee's Note at 106. Even if individual questions arise during the course of litigation, which render the action 'unmanageable,' the court still has the power at that time to dismiss the class action and permit the plaintiff to proceed only on behalf of himself. Fed.R.Civ.P. 23(c) (1). Therefore, at this early stage of the proceedings, we find there has been an adequate demonstration that common questions of law or fact predominate over individual questions. See Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966)."

It appears nearly a certainty that the individual issues that might arise in the present case nowhere approach the number nor the burden likely to arise in the *Eisen* case.

Lower federal district courts have reached the same result in antitrust treble damage suits over defendants' contentions of lack of predominance similar to those raised here. In State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F. Supp. 391, Civil No. 7–1932–C–2 (S.D. Iowa, filed Mar. 14, 1968), the court held that a price-fixing conspiracy suit brought by the State of Iowa on behalf of all purchasing governmental entities in the state contained common questions of law and fact predominating over non-common questions. There defendants attempted to show that the entirely diverse damages questions would predominate over common questions. The court rejected the position, after stating the defendants' contention as follows:

> "* * * Numerous disparate facts are set out in the defendants' brief which are said to indicate the unavailability of a class action. Many have to do with the manner in which the members of the alleged class have purchased asphalt products from the defendants.

Some members purchased directly from the defendants while others negotiate with contractors who agree to supply asphalt products. Variations in the kind of asphalt product purchased, differences in prices due to transportation charges and quantity of purchase, normal variations in price due to market conditions, and other factors are described in detail in the briefs and affidavits."

The Iowa court relied upon and adopted the reasoning of the court in Philadelphia Elec. Co. v. Anaconda Am. Brass Co., supra, where similar arguments against Rule 23 treatment were raised by defendants. There it was stated that:

> "The defendants point out that the products mentioned in the complaint include 'at least twelve separate groups of products which are separately priced and have distinct end uses'; that plaintiffs may have purchased like products from other manufacturers, at prices not shown to have been affected by the alleged conspiracy; that during the period covered by the alleged conspiracy there were dozens of price changes in each product-line; and that there were wide variations in methods of purchase and in prices actually paid. But these circumstances, it seems to me, demonstrate merely (1) the possible desirability of establishing subclasses as the facts develop; (2) the likelihood that plaintiffs may be unable to prove all they claim; and (3) the fact that many of the issues relating to damages are individual rather than common to the class. Cf. Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); Fischer v. Klezt, 41 F.R.D. 377 (S.D.N.Y.1966)."

Both courts appeared convinced that in the normal antitrust case, where a conspiracy to fix prices is at issue, but damages differ widely among the several plaintiffs, the predominant questions are common to the class.

Defendants argue that the above two decisions reached improper results under Rule 23(b) (3). School Dist. of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967), is said to present a better analysis. There the price-fixing alleged dealt with library editions of children's books. The conspiracy was alleged to be a national conspiracy, and originally (though later modified) the class was claimed to comprise "all public libraries and schools and school systems maintaining libraries * * * and other educational institutions * * * situated throughout the United States, * * * aggregate 60,000 in number." The court noted that the commodity involved was "commercially unique" in deciding that the case did not qualify under 23(b) (3). The court found that there were many small, intricate transactions, where prices varied according to the "demand, the publisher, the cost of the reading content, the illustrations and the binding." The court envisioned difficulties of management of such a nationwide suit as a class action.

Also furnished the court by defendants is the case of City of New York v. International Pipe & Ceramics Co., 44 F.R.D. 584. (S.D.N.Y., filed April 16, 1968), dealing with an alleged conspiracy in the concrete pipe industry. The refusal to countenance that case as a class action is based on far different grounds than exist in the case at bar. The City purported originally to represent all governmental agencies "in the United States"; later those east of the Rocky Mountains. The court pointed out that already there were some 66 similar cases pending throughout the United States. Defendants were not sellers beyond 150 to 200 miles from their plants or places of business; apparently the conspiracies were local in nature. The court stated:

> "Only a very small number of the total end user purchasers whom plaintiff would represent as class members did in fact purchase from the handful

of manufacturers named as defendants in this action."

*Philadelphia Electric* and *Union Asphalt* better exemplify the normal claimed antitrust price-fixing situation such as alleged to be present in the matter at hand, while *School District of Philadelphia* illustrates the unusual suit not limited in territory and dealing with "commercially unique" products. The issues must not be "pre-tried" by the court at this stage of the litigation, Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967), though it seems in any event that the suits at bar do not contain horrendous damage questions. Somewhat diverse modes of acquisition are presented in nearly all antitrust litigation. While doubtlessly some of the difficulties of damage proofs paraded by the defendants will occur, most claimants should have little trouble and raise relatively simple questions. Steel is not a unique product, but rather is sold in transactions similar to other industrial products. Moreover, the number of claimants here is far less profuse than in *Eisen*. In sum, here as in the normal antitrust case, proof of the conspiracy will present the predominant questions of both law and fact. Cf. M. Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 43 (1967); Advisory Committee's Notes, 39 F.R.D. 69, 103 (1966).

The court also finds that class actions will be superior to other available methods of resolving the disputes. When the parties are as numerous as they are here, joinder is an extremely large burden on the court and its facilities. An additional consideration is that similar claims might well go unprosecuted by any other alternative. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, No. 30934 (2d Cir., Mar. 14, 1968). While claims held by steel purchasers would undoubtedly normally be larger than those brought in the *Eisen* case, nevertheless, it is extremely difficult to bring an antitrust action against six major steel fabricators without the financial aid made possible by the class action device. Few are the individual claimants with a sufficient interest at stake or resources to bring a suit requiring proof of a conspiracy among business corporations. Discovery expense alone normally would be prohibitive. The court therefore deems the class action device to be superior to any other alternative such as Rule 20 joinder or Rule 24 intervention. Since avoidance of multiplicity of litigation is greatly to be favored, the class action device as invoked in this instance well serves such purpose.

The court in finding as above has considered and employed the criteria set forth in 23(b) (3) (A) (B) and (C) and as to (D) envisions that the difficulty in management of the class actions is within reason and is not insurmountable. The court has not permitted itself to be persuaded either way by the statute of limitations questions. To quote from *Philadelphia Electric:*

> "* * * Plaintiffs should not be rewarded for delay in filing suit by a lowering of the standards for class action approval. On the other hand, however, the suggestion that the standards for class action approval should be more stringent for actions commenced near the expiration of the period of limitations, is equally unacceptable."

Statute of Limitations—§ 5(b) of the Clayton Act.

For the reasons stated in the foregoing portion of this memorandum, the four State actions and the consolidated Third Division actions may be maintained under Rule 23(b) (3). The question remains whether the applicable statute of limitations provides reason for not giving notice to absentee class members pursuant to 23(c) (2) because they are barred. Section 5(b) of the Clayton Act controls the limitation period since these private suits involve almost precisely the questions and situations alleged in the earlier government criminal proceedings. Plaintiffs have failed to commence their

suits within the one year tolling period subsequent to termination of the government case, and so the four year provision of § 5(b) applies. Without acknowledging or conceding any issue regarding fraudulent concealment, defendants admit *arguendo* that the representatives filed these actions before expiration of the four year period provided by § 5(b), measured from the date the grand jury returned a criminal indictment against the six defendants. Likewise, a similar concession is made for the sake of argument with regard to the absentee plaintiffs; defendants admit that these absentees were not barred by the statute if so applied at the time the class actions were filed. Defendants, however, strenuously contend that the filing of these suits as class actions under 23(b) (3) did not toll the statute of limitations as to absent class members who did not file their own independent actions before the statute of limitations ran against them. Thus, it is argued that even though the actions are otherwise proper 23(b) (3) suits, notice to absentees is not required and should not be given because such members are barred in any event. Notice therefore is said to be futile. Plaintiffs contend that not only the case law demands a different result and supports their position that the statutory period is tolled by commencement of a class action under 23(b) (3), but argue additionally that policy measures intrinsic to antitrust law compel a like result. The question is not free from difficulty.

Commencement of a Rule 23(b) (3) class action tolls the four year statute of limitations provided by § 5(b) of the Clayton Act. The court reaches this conclusion and so finds based upon three considerations: (1) the only reported decision found to date under the new Rule 23 held the statutory period tolled under very similar circumstances; (2) the vast majority of pre-amendment Rule 23 cases established the propriety of tolling in "spurious" class actions; and (3) policy considerations inherent in § 5(b), plus the changes wrought by new Rule 23(b) (3), demand that tolling be permitted.

After the July 1, 1966 effective date for new Rule 23, the only court which apparently has encountered the tolling problem is Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, No. 41734 (E.D.Pa., filed Jan. 23, 1968). There several private treble damage actions under the antitrust laws were commenced as Rule 23(b) (3) class actions shortly before termination of the § 5(b) limitation period. In concluding that absentee class members were not barred and should be given notice pursuant to 23(c) the court stated the arguments and legal conclusions of the parties at length, rejected their premise that a negative ruling on class action maintenance would preclude the absentee members from bringing suit, and decided that affirmative class action determinations relate back to the time of the institution of the lawsuits. Defendants in *Philadelphia Electric* raised the precise arguments raised at bar:

> "* * * The defendants argue * * that to permit a class action under these circumstances would be to approve the resurrection of a lot of stale claims and the stirring-up of unwarranted litigation which would not otherwise have occurred to anyone; that under the circumstances it is highly unlikely that silent class members could have been relying on the class action as the vehicle for vindicating their rights; and that, from the standpoint of court congestion, the total avoidance of a large number of lawsuits is obviously 'superior' to the class action here attempted."

Since these arguments were all rejected by the court, the case, which is nearly identical to the matter at bar, is persuasive authority for plaintiffs herein. The form of notice in that case was to be proposed by the parties. Because of the numerous class members involved, the court required that members of the class electing not to be excluded from the class

be directed to file proofs of claim on or before a specified date with failure to comply tantamount to adjudication of no claim on the merits.

Under the pre-amendment case law, the majority of courts passing upon the tolling problem concluded that the institution of a spurious class action tolled the applicable statute of limitations for the benefit of absentee class members. See Escott v. Barchris Constr. Corp., 340 F.2d 731 (2d Cir. 1965), cert. denied, Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1966) (Securities Act of 1933); Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961), petition for cert. dismissed, Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962) (Sherman Act); Culver v. Bell & Loffland, Inc., 146 F.2d 29 (9th Cir. 1944), (Fair Labor Standards Act); York v. Guaranty Trust Co., 143 F.2d 503 (2d Cir. 1944), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Newberg v. American Dryer Corp., 195 F.Supp. 345 (E.D.Pa.1961) (Securities Act of 1933); Kam Koon Wan v. E. E. Black, Ltd., 75 F.Supp. 553 (D.Hawaii 1948) (Fair Labor Standards Act); Mutation Mink Breeders' Ass'n v. Lou Nierenberg Corp., 23 F.R.D. 155 (S.D.N.Y.1959) (Lanham Trade-Mark Act). Additionally, plaintiffs receive support from Professor Moore in 3A Moore, Federal Practice ¶ 23.12, at 3476 (2d ed. 1967).

Defendants rely principally upon three decisions. Athas v. Day, 161 F.Supp. 916 (D.Colo.1958) and P. W. Husserl, Inc. v. Newman, 25 F.R.D. 264 (S.D.N.Y.1960) are said to clearly support the defendants' position, while Escott v. Barchris Constr. Corp., supra, cited by plaintiffs favorably, also is said to support the defendants. The court, rather than dwell at length in analysis of these conflicting cases,[22] notes that the weight of authority under pre-amended Rule 23 spurious class actions quite decisively points toward the plaintiffs' contentions herein. However, no Supreme Court case nor any decision of the Eighth Circuit supporting defendants' position has been brought to the court's attention. The issue is not free from doubt elsewhere as demonstrated by the above conflicting cases, but in the court's opinion policy considerations augur for the weight of authority of cases under old Rule 23 with even greater force under amended Rule 23(b) (3).

The policy approach to the limitation question is stressed in most recent authority discussing the problem. See Escott v. Barchris Constr. Corp., supra; Advisory Committee's Notes, Proposed Rules of Civil Procedure, 39 F.R.D. 69, 99, 104 (1966); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure, 81 Harv.L.Rev. 356, 384 (1967); Note, Class Actions Under Rule 23 and Federal Statutes of Limitation: A Study of Conflicting Rationale, 13 Vill.L.Rev. 370 (1968). But see, 2 Barron & Holtzoff, Federal Practice & Procedure § 568 (Wright ed. Supp. 1968). Such a policy analysis looks to the statute of limitations in question as well as the possible consequence under Rule 23(b) (3).

New Rule 23(b) (3) removes most of the possible pernicious effects of tolling present under the unamended Rule 23 and the line of cases exemplified by Union Carbide & Carbon Corp. v. Nisley, supra. That decision reached a proper result in a § 5(b) context. New Rule 23 removes the problem of "one-way intervention" prevalent in the *Union Car-*

22. For an excellent analysis of the case law dealing with tolling problems under federal statutes of limitation, see Note, Class Actions Under New Rule 23 and Federal Statutes of Limitation: A Study of Conflicting Rationale, 13 Vill.L.Rev. 370 (1968).

*bide* case.[23] There the absentee members of the spurious class were permitted to intervene even after judgment for the class had been entered and the statute of limitations had run. Thus, such members were able to await the outcome of the action to decide whether to enter the class. If the plaintiffs lost, they would not intervene and consequently would not be bound by the judgment and (if still within the statute of limitations) could commence their own suit while if successful, the absentees could directly benefit. Naturally, this situation evoked much criticism from the authorities. Under the new Rule 23 such "one-way intervention" is not possible, for the class determination is to be made as soon as possible after institution of suit. Absentees thus are compelled when in receipt of notice under 23(c) (2) to make a binding decision within a short time of commencement of the suit, and surely never after a decision on the merits. Much of the inequity of *Union Carbide* is dissipated in this fashion.

Defendants quote extensively from the legislative history of § 5(b)[24] in an effort to show that the policy of that section is frustrated by permitting maintenance of a suit such as this as a class action. It is possible to argue that Congress has given liberal treatment to antitrust civil litigants already, and therefore class action tolling is superfluous and an unwarranted extension.[25] There is doubt that Congress ascertained a problem of tolling in this situation at all.[26]

Defendants further argue that the § 5 (b) limitation policies must be discerned in light of Order of R. R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944), where the court noted the policy underlying statutes of limitation:

> "Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Id. at 348–349, 64 S.Ct. at 586.

The defendants conclude that a 23(b) (3) complaint does not sufficiently give notice to defendants so as to satisfy the *Railway Express* case, since it only tells of other absentee members and is not specific as to their identity nor as to whether they will or will not enter the action. Two observations are pertinent in this regard. First, notice is given by the filing of the styled class action and defendants thus are forewarned of im-

23. The Rules Advisory Committee spoke with particularity about the problem of one-way intervention:

> "Hitherto, in a few actions conducted as 'spurious' class actions and thus nominally designed to extend only to parties and others intervening *before* the determination of liability, courts have held or intimated that class members might be permitted to intervene *after* a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. * * * Under proposed subdivision (c) (3), one-way interevention is excluded * * *."

24. S.Rep. No. 619, 84th Cong., 1st Sess. 6 (1955); H.R.Rep. No. 422, 84th Cong., 1st Sess. 6, 9 (1955). These reports deal with the purposes sought to be furthered by § 5(b).

25. See 13 Vill.L.Rev. 370 (1966).

26. See generally, Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); State of Michigan v. Morton Salt Co., 259 F.Supp. 35 (D.Minn.1966), aff'd sub nom. Hardy Salt Co. v. State of Illinois, 377 F.2d 768 (8th Cir.), cert. denied, 389 U.S. 912, 88 S.Ct. 238, 19 L.Ed.2d 260 (1967).

pending litigation. While it is true that the exact number of plaintiffs is unascertainable, the court believes that defendants are advised sufficiently to avoid surprise, preserve records relevant thereto (especially where only one conspiracy is alleged and the geographic limitations are quite well defined), and begin defense preparations. Second, under the new Rule 23, the class membership will be defined in the normal situation shortly or within a reasonable time after the statutory period expires. So, in the matter at hand, defendants have been unaware of the precise number of class members beyond the limitation period only for the short time between February 10, 1968, and the date required for response to the notice prescribed by the court herein.

While it is true that the reliance of class members upon the bringing of the class action and thus not bringing their own action may be de minimus in this case, the court does not believe that the "stirring up" of litigation argument is persuasive here. The consequences to potential class members should in fact be irrelevant, since the statute of limitations is a defendant's shield. If the defendant receives the protection the statute guarantees, its policy is satisfied. That plaintiffs did not in fact rely is unimportant. Moreover, the State plaintiffs here allege that but for their own reliance upon prior case law tolling the statute, they would have forewarned the lesser state entities of the need for dispatch in bringing their own litigation. Since this is a different, clearer reliance than that in York v. Guaranty Trust Co., 143 F.2d 503 (2d Cir. 1944), rev'd on different grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), which is now rejected by most authority, the reliance rationale is more appropriate here.

In sum, this action may be maintained as a class action under Rule 23(b)(3) and it is so ordered.

*Overlapping Classes.*

Four State Attorneys General have brought class suits representing all significant lesser governmental entities within their respective jurisdictions. These representatives are proper representatives of their classes and within the scope and purport of Rule 23(b)(3). The Third Division cases, however, which were filed prior to the four State cases seek to represent the same governmental entities. No cases claim to represent any class comprised of private individuals. If all suits are given class action status, all lesser governmental entities are within one of the classes represented by the States, as well as the Third Division classes. This over-lap in the court's judgment is best resolved by permitting the maintenance of the Third Division suits as class suits only to the extent that absent class members may request entrance to the class if so desired, within the time hereinafter prescribed by the court without, however, there being any notice on behalf of these plaintiffs sent from this court or otherwise pursuant to Rule 23(c). The net effect, therefore, will be to give any such intervenors or absent class members the benefit of the Third Division filing date for purposes of the statute of limitations tolling and to this extent the Third Division actions will continue as class actions. The "superiority" criteria of 23(b)(3) explicitly permits the court to look at the existence of other law suits when deciding whether a class action should be maintained.

While the giving of notice pursuant to Rule 23(c) may always arguably create a problem of solicitation by the very nature of the Rule, nevertheless such should be avoided whenever and to the extent possible. In this situation, the best resolution seems to be with permitting the Attorneys General to assume this task and to speak for and represent the class members in court; provided that any member of the class may be separately represented if it

wishes and/or may elect to, and will be permitted as above stated and within the times hereinafter limited, join the Third Division cases. The Attorneys General act in parens patriae, as it were, and have a responsibility to the various lesser governmental entities which the City of St. Paul, for instance, does not have. Further it would be expected that Attorneys General will not charge the prospective class members a percentage of any recovery made as a fee for their representation.

The court realizes that possibly problems may exist and will have to be solved in the future as to "lead counsel" for plaintiffs, division of work, areas of responsibility, etc., although the court sincerely hopes plaintiffs' counsel will be able to work these matters out among themselves. If, however, plaintiffs ultimately prevail and the court awards in addition to the recovery made, an attorney's fee as permitted by the Clayton Act, 15 U.S.C. § 15, the court reserves the question as to the division thereof and does not purport now to establish the amount of, nor the right or rights in and to a legal fee upon completion of the law suits. The court will attempt to evaluate the contributions made by various plaintiffs counsel and establish fees accordingly.

*Notice Under Rule 23(c).*

The Rule provides that "the court shall direct to the members of the class the best notice practicable * *." The court does not interpret this as requiring personal notice from the court itself but as permitting the court to direct one or some of the parties to give a notice in such form as the court may approve. Each of the Attorneys General in the Fourth Division cases has indicated it has adequate lists of, and facilities for mailing notice to, governmental entities within its borders. The court therefore directs that these offices fulfill this function of giving notice. The notices should contain the matter required by Rule 23(c) (2), and in addition should include something in the nature of a verified proof of claim form to be filled out and returned so as to indicate name of the claimant, the appropriate or knowledgeable government official familiar with the details of the claim, the gross amount of purchases and dates thereof for which claim is made, the person or firm from or through whom bought or general contractor dealt with, type of building or structure into which the steel was incorporated or other end use made of the product and any other matters deemed appropriate. Attached to or accompanying the proof of claim form should be a certified resolution of the governing body authorizing the submission of the claim. Plaintiffs may desire from, or may wish to furnish to, class members other information. There is no prohibition by the court against such, provided that the notice or any information shall be informative and not urging action nor solicitations. The following timetable is established:

WITHIN 10 days from date of this order, Fourth Division plaintiffs shall submit to all defendants, the other plaintiffs, and to the court for its approval, a copy of the proposed notice and proof of claim forms.

WITHIN 10 days thereafter, defendants, and the other plaintiffs may send to these plaintiffs and to the court suggestions or objections as to the form of notice and proof of claim forms for consideration by the court.

WITHIN 15 days from the court's approval of the notice and proof of claim form, the same shall be transmitted to the prospective members of the class by the four Attorneys General.

WITHIN 60 days from such latter date, Fourth Division plaintiffs shall file with the clerk of this court and makes copies available to each defendant the responses or proofs of claims received from the members of the class, and this, subject to fur-

ther court order, shall then comprise the classes (together with any such filings in addition to present pleadings made by or in the cases represented by the Third Division plaintiffs) and all not so filing shall be barred and excluded from the classes. Each Attorney General also shall file and furnish a copy to the other parties proof of mailing, showing a list of those to whom mailed.

## II.

## QUALIFICATIONS OF PLAINTIFFS' COUNSEL

On March 15, 1968, at the opening of the informal pretrial conference, objection was made by defendants to the appearance for the Third Division plaintiffs of a member of the District of Columbia Bar whose admission to this court had been moved for the purpose of participating with local counsel in this litigation. The objection was based on Canon 36 of the American Bar Association Canons of Ethics that, as a lawyer, he had been an employee of the Department of Justice, Antitrust Division in 1964 at the time of the investigation and ultimate criminal indictment of the six defendants in this case. He did not leave the Department of Justice until November, 1966. Canon 36 provides in pertinent part:

> "A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."

The court heard oral evidence and satisfied itself that while with the Department of Justice, counsel did not handle nor was he assigned to the cases involving the steel industry at any time; that he never saw any grand jury minutes or documents, nor participated in such proceedings; that he never saw or examined any F.B.I. reports or any other governmental agent's reports; that he never examined the Department of Justice files on the steel cases nor conferred with anyone within the Department of Justice about the cases. At the time of instituting these cases, as a former employee, he had, and now has, no greater rights or "in" with the Department of Justice than any other practicing attorney. In view of this showing, the court holds that plaintiffs' counsel is not in violation of Canon 36, in that he never "investigated or passed upon" any matters relating to the case at bar. The rationale and holding of Hilo Metals Co. v. Lerner Co., 258 F.Supp. 23 (D.Hawaii 1966) is thus not applicable here; nor is the "appearance of evil" doctrine espoused by Judge Kaufman in United States v. Standard Oil Co., 136 F.Supp. 345 (S.D. N.Y.1955) and in a subsequent article which he authored, The Former Government Attorney and the Canons of Professional Ethics, 70 Harv.L.Rev. 657 (1957). Allied Realty of St. Paul, Inc. v. Exchange Nat. Bank, 283 F.Supp. 464 (D.Minn., 1968) is clearly distinguishable. That was a case where counsel had participated actively in a 13-week government criminal trial, had examined F.B.I. reports, grand jury transcripts, etc., all involving many of the same issues and facts as later were involved in a private damage suit in which the former government counsel appeared for plaintiffs. There the attorney had "investigated and passed upon" and the "appearance of evil" could be said to exist.

Defendants further raised the possibility that counsel for plaintiffs may have solicited the retainer of his law firm to handle the Third Division cases in violation of Canon 28 of the Canons of Ethics. Defendants requested permission to take certain depositions to inquire into this field and the court permitted such to the extent of taking the depositions of two members of the City of St. Paul corporate counsel's office. These were available at the April 15, 1968 hearing. On the basis thereof, and the records as a whole, and assuming

*arguendo* that defendants have standing to make this challenge, the court concludes and makes a finding that there is no showing or evidence of any solicitation on the part of plaintiffs' counsel; that the members of the City of St. Paul corporate counsel's office who were deposed are reputable and respected members of the Minnesota Bar and their testimony accords with that given by plaintiffs' counsel to the effect that it was the City of St. Paul which approached the Washington, D. C. law firm (of which plaintiffs' counsel is a member) seeking advice on antitrust matters, including the possibility of instituting the action in the case at bar. Any further inquiry into this aspect could go far afield and the court declared at the hearing on April 15, 1968, that it was satisfied that there has been no violation of Canon 28. Plaintiffs' counsel is therefore admitted to this court for the purpose of participating in this litigation with local counsel, and defendants' motions to require further answers from deponents in the depositions and for leave to take further depositions are denied. It is so ordered.

III.

MOTION FOR INTERVENTION

Counsel for Third Division plaintiffs has moved, on behalf of and representing the Minneapolis-St. Paul Metropolitan Airports Commission, an agency of the State of Minnesota, to intervene as a party plaintiff in the City of St. Paul action (or the consolidated Third Division actions). Since this Commission would be, and is, one of the members of the class, and since it has chosen to be identified with the St. Paul action and to be represented by legal counsel other than the Attorney General, and since at the last hearing there was no objection raised to this motion other than the general one by defendants as to the maintenance of class actions, this motion is granted and it is so ordered.

IV.

MOTION TO DISCLOSE GRAND JURY WITNESSES AND SUBPOENAS

The Third Division plaintiffs by written motion seek an order on behalf of themselves and the other plaintiffs authorizing their attorneys to inspect and copy all subpoenas issued to, and all lists of names of, witnesses appearing before the federal grand jury for the District of Minnesota in the investigation antedating the criminal indictment which was returned on February 10, 1964, charging the defendants herein with violations of the antitrust laws. Plaintiffs' grounds for the motions are three:

(1) "The interests of justice require that such information, available to and in possession of defendants in this litigation, should be equally available to plaintiffs;"

(2) "The importance of the testimony which witnesses gave during the course of the grand jury investigation and the likely importance in the [sic] connection with the pending litigation, demonstrates the immediate need for the requested information prior to the initiation of discovery;" and

(3) "The interests and even-handed application of justice requires prompt disclosure to plaintiffs of information which has been made available to defendants."

Defendants resist this motion principally upon the ground of traditional grand jury secrecy[27] which is said to encompass

27. Fed.R.Crim.P. Rule 6(e):
"Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, in-

information including subpoenas and witnesses' names as well as the minutes. Furthermore, defendants contend that the reasons justifying disclosure to civil litigants are wholly absent in the matter at bar, and that United States Indus., Inc. v. United States Dist. Court, 345 F. 2d 18 (9th Cir.), cert. denied, 382 U.S. 814, 86 S.Ct. 32, 15 L.Ed.2d 62 (1965), cited as dispositive by plaintiffs, is inapposite. The court finds in accordance with the defendants' position, and, accordingly, denies the motion for access to the list of grand jury witnesses and subpoenas.

While the Supreme Court has vigilantly recognized the policy of secrecy in conjunction with grand jury proceedings, see, e. g., Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943), nevertheless, exception is made under these cases when the movants for disclosure show "particularized need." Under the facts presented at bar, plaintiffs have not in the court's opinion shown sufficient "particularized need" to merit disclosure, at least at this time.

Defendants represent to the court that they have neither had nor do they have access to the information sought. Some of what defendants know of the grand jury proceeding was gleaned from government summaries of certain grand jury testimony with the witnesses' names deleted by the court. These summaries were made in conjunction with the government's motion for sentencing in the criminal proceedings previously mentioned. The information plaintiffs seek to discover here is stated never to have been disclosed to defendants.[28] The major reason for secrecy of proceedings at this late stage is to prevent intimidation of future grand jury witnesses who might believe their names would be released if names were disclosed here, and hence be reluctant to testify. See Note, Release of Grand Jury Minutes in the National Deposition Program of the Electrical Equipment Cases, 112 U.Pa.L.Rev. 1133 (1964);[29] United States Indus., Inc. v. United States Dist. Court, supra. Witnesses' names are matters before the grand jury and so are entitled to secrecy. Application of State of California, 195 F.Supp. 37, 40 (E.D. Pa. 1961). Plaintiffs have cited no decision going so far as to permit violation of grand jury secrecy merely for purposes of discovery by plaintiffs in a subsequent civil suit against the same defendants. In sum, plaintiffs have failed to bear their burden at this point in the litigation which is a prerequisite to

terpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of a defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule."

28. Certain it is that defendants must have knowledge of at least some of the grand jury witnesses, for undoubtedly one or more of their own employees were called together with others in the industry who would be known to defendants. Appropriate interrogatories or other discovery proceedings undoubtedly can ascertain these names.

29. Apparently disclosure of grand jury proceedings was permitted to some extent to plaintiffs in civil antitrust cases in what have been styled the Electrical cases (some unreported) for the purposes of impeachment and the refreshing of recollection. No such exigency appears here, at least at this stage of the case.

revealing grand jury information. The normal routes of civil discovery will well give plaintiffs adequate opportunity to prepare their case. Mere savings of monetary burden will not suffice to bring the court's discretion into play under Rule 6(e), Fed.R.Crim.P. United States v. Procter & Gamble Co., 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Application of State of California, supra; City of Philadelphia v. Westinghouse Elec. Corp., 210 F.Supp. 486 (E.D. Pa.1962). The time may come when the parties are well into or have completed their discovery that a "particularized need" will become apparent for disclosure of the information requested. If a proper showing subsequently is made, the court will be open to consider an appropriate motion in this regard.

V.

MOTION TO VACATE PRIOR ORDER

Plaintiffs counsel has moved the court to vacate the order of the Honorable Edward J. Devitt, a judge of this court dated July 13, 1964, in which order the judge ordered that certain information "shall not become a part of the public records." This court indicated at the time of hearing that he would discuss this motion with Judge Devitt. He advises that the submissions were really briefs by the government and each of the defendants, dealing with sentencing, and done for the purpose of affording a guide to the court upon which to impose appropriate sentences. The government submitted a "statement of facts" and each of the defendants submitted a similar statement of facts. The court at the time indicated that the submissions would be confidential and the same were in fact not filed.

It has long been the policy of this court not to disclose presentence investigatory reports from the Probation Officer. It seems to this court, affirming the opinion held by Judge Devitt, that the submissions were in the nature of or in the same category as probation office reports and should be held confidential. Again, the time may come when the parties have completed their discovery that the court will wish to reconsider this ruling, but a promise of confidentiality given and ordered by the court prior to any submissions should not be lightly removed and since at least at this time there is an absence of a showing of any real exigency, the court rules that the motion should be denied. The court is not unaware of United States Indus., Inc. v. United States Dist. Court, supra, wherein the court exercised his discretion and permitted a disclosure of a somewhat similar document. This court exercises its discretion to deny disclosure.

VI.

CONSOLIDATION

Counsel for Third Division plaintiffs has moved to consolidate the four Third Division cases. The court is quite clear as to the reasons for, and the advantages of, a consolidation, though does not find in plaintiffs' moving papers whether counsel wishes true consolidation so that the Third Division cases result in but one judgment and thus one right to appeal, or whether he wishes something less.[30] No opposition was voiced to the motion, though no similar motion was made by the Fourth Division plaintiffs.

Rule 42(a) of the Federal Rules of Civil Procedure provides:

> "Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such

30. For the various meanings and concepts of the term consolidation within the purview of Rule 42(a), see 2B Barron & Holtzoff, Federal Practice & Procedure § 941 et seq. (Wright ed. 1961).

orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

The court believes that all eight actions, plus the complaint in intervention of the Metropolitan Airports Commission as an intervenor in the Third Division cases, should be consolidated (or at least treated jointly) for purposes of all pretrial matters, all motions and discovery proceedings, and certainly for trial. Each of the eight plaintiffs may of course, and should, it would seem continue to be separately represented and participate separately in the trial. A consolidation as the court envisions and intends will result in but one trial which will bind all parties plaintiff and defendants, as well as all class members, and is indeed the purport of the Recommended Procedures for Protracted Litigation and is necessary to save time, money and multiplicity of litigation. Separate judgments will be expected to result, however, and appellate rights should not be consolidated. The motion to consolidate is granted and ordered, as and to the extent above as to all cases, both Fourth and Third Division cases. The question of severing the trial and perhaps trying the conspiracy issue first and separately, and the damages and fraudulent concealment issues either thereafter or theretofore is reserved for later consideration by the court.

## VII.

## DISCOVERY PROCEEDINGS

At the institution of these actions, the court entered orders temporarily restraining discovery. Plaintiffs have moved to lift the orders, at least to the extent that will permit plaintiffs to pose interrogatories to defendants concerning conspiracy. The court is of the view that the restraining order should continue for the time being and it is so ordered. Until the court's order determining the classes to be made after submission of proofs of claims and related documents as hereinabove provided, it is not feasible to make a specific schedule for any type of extensive discovery. The court would contemplate an additional pretrial conference within 30 days after such date and would request that at that time the parties submit a schedule and plan, hopefully agreed upon in advance, for the taking of depositions, identification, deposit and inspection of documents, requests for admissions and any other discovery proceedings. The court would then attempt to fix a time table or schedule for discovery.[31]

The only discovery feasible at this time it would seem is the serving of interrogatories. After 30 days from date hereof, plaintiffs may, if they wish, submit interrogatories to the defendants relating to questions germane to conspiracy; provided that defendants may have 75 days within which to answer the same despite the 15 day limitation of Rule 33; provided further that any objections to the interrogatories or requests for protective orders shall be promptly noticed and submitted to the court after receipt by defendants of the interrogatories.

After 30 days of the filing of the proofs of claims following notice to members of the class, defendants may pose "transaction" interrogatories to plaintiffs and to all members of the class; provided 60 days shall be allowed for answers thereto.

31. The court's oral order from the bench made on the record March 15, 1968 will remain in full force and effect to the end that none of the parties shall destroy or remove from the court's jurisdiction any documents or evidence now in existence relating to this case, used in the prior grand jury proceedings or relating in general to the business of selling structural steel or relating to knowledge on the part of plaintiffs or class members.

VIII.

EXTENSION OF TIME TO DEFENDANTS TO ANSWER

Defendants, at the first pretrial hearing and renewed at the second pretrial hearing on April 15, 1968, moved the court to extend the time to answer, move or otherwise plead to the plaintiffs' complaints. This motion was granted. The court no longer can see a valid reason why responsive motions, answers or other pleadings should not be interposed. Consequently the court orders that the time within which defendants may so answer, move or otherwise plead expires 30 days from the date of this order.

IX.

MOTION TO STRIKE ALLEGATIONS OF COMPLAINTS

Each of the eight complaints makes specific references to, and pleads in some detail, the government investigation of the steel industry, the return of the criminal indictment by the grand jury and the *nolo contendere* pleas entered by all of the defendants. The claim of the defendants is that under Rule 12(f) of the Federal Rules of Civil Procedure, these allegations are immaterial, impertinent and highly prejudicial.

The plaintiffs all concede that *nolo contendere* pleas do not establish a *prima facie* case against defendants because under § 5(a) of the Clayton Act they are denominated the equivalent of consent judgments. However, plaintiffs argue that the government proceedings are material and relevant in establishing fraudulent concealment, which is clearly in issue at this stage of the cases, and become essential in establishing the tolling of the statute of limitations. Since rule 9(b), Fed.R.Civ.P., requires particularity in pleading fraud, plaintiffs submit that the government proceeding must be pled.

On the authority of State of Illinois v. Sperry Rand Corp., 237 F. Supp. 520 (N.D.Ill.1965) and N. W. Elec. Power Cooperative v. General Elec. Co., 30 F.R.D. 557 (W.D.Mo.1961), the court disagrees with plaintiffs and accordingly grants the defendants' motions to strike all allegations in the original or amended complaints relating to the above discussed matters. Plaintiffs may continue to plead that the date of discovery was not until February 10, 1964, but no reference should be made otherwise to the criminal proceedings. Against the objection that the court is ruling now and in advance on the admissibility of evidence, suffice it to say that this matter is sufficiently prejudicial to defendants as to require this action now. Such striking of course will not limit discovery scope and is not intended to. Plaintiffs' counsel will furnish to the clerk and counsel amended pleadings, or substitute sheets to supplant those in the present pleadings within 30 days from the date of this order.

From the complaints in State of Minnesota, State of North Dakota and State of Wisconsin cases, the following is stricken:

1. From paragraph 18: "* * * the filing of the indictment by the United States referred to hereinafter * * *"
2. All of paragraph 22.
3. From paragraph 23: "* * * the institution of proceedings by the United States of America against the defendants hereon * * *"

From the complaint in the case of State of South Dakota, the following is stricken:

From paragraph 11: "* * * when it had learned of the indictment filed against the defendants herein in the United States District Court for the District of Minnesota, Fourth Division * * *"

From the original complaints of all four Third Division plaintiffs the following is stricken:

1. From paragraph 16: "* * * after an indictment, hereinafter

alleged in Paragraph 17 was brought by the United States against the defendants * * *"

2. All of Paragraph 17.

From the amended complaints of all Third Division plaintiffs and the complaint of intervenor Metropolitan Airports Commission, the following is stricken:

1. From paragraph 17: "* * * when an indictment changing a similar combination and conspiracy was brought by the United States against the defendants * * *"

and

"* * * when defendants were convicted on pleas of nolo contendere * * *"

2. All of paragraph 18.

Let this be filed as an order in all eight pending cases.