**STATE OF ILLINOIS, Plaintiff,**

**v.**

**HARPER & ROW PUBLISHERS, INC.,**
**et al., Defendants (and related**
**cases).**

**No. 67 C 1899.**

United States District Court
N. D. Illinois, E. D.
April 25, 1969.

have been transferred to this court for consolidated discovery and pretrial proceedings. Originally instituted in eight judicial districts, the private treble damage suits seek compensation for alleged conspiracies which inflated the prices for children's editions of library books. The plaintiffs, who are largely state and local governments, claim to have been overcharged as a result of either (1) a horizontal agreement among the industry's book publishers, or (2) a series of vertical conspiracies between each publisher and its wholesalers.

Under F.R.C.P. 23(b) (3), the attorneys general for several states aim to represent the public libraries, school districts, and boards of education in their respective jurisdictions. Similarly, the School District and the City of Philadelphia purport to represent a class composed of the 1324 largest public libraries and school districts in the nation. Although most of the antitrust action may be returned eventually to their transferor courts for trial, the Judicial Panel on Multidistrict Litigation has ruled that the transferee court should decide class action questions. In Re Plumbing Fixture Cases, D.C., 298 F.Supp. 484 (December 27, 1968).

The congruence of issues in each class action request is remarkable. The underlying conspiracies, the accused defendants, and the aggrieved plaintiffs stand in virtually identical positions. Therefore, except as otherwise indicated, the opinion will discuss all motions collectively.

Initially, a class action must satisfy the four prerequisites specified in F.R.Civ.P. 23(a).[1] First, since the class members number in the hundreds in each action, joinder is impracticable. See, e. g., Cypress v. Newport News G. & N. Hospital Ass'n, 375 F.2d 648 (4th Cir. 1967); Clemens v. Central R. Co.

---

## MEMORANDUM OPINION

DECKER, District Judge.

Pursuant to 28 U.S.C. § 1407, more than forty separate antitrust actions

---

1. "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

of N. J., 264 F.Supp. 551 (E.D.Pa.1967); Bowe v. Colgate-Palmolive Co., 272 F. Supp. 332 (S.D.Ind.1967). Second, questions of law and fact are common to the class because the alleged conspiracies inflated the prices charged all purchasers of library editions.[2] Third, the claims of the representative parties are typical of the claims of the class because, having identical interests, all plaintiffs will offer the same evidence to prove the illegal conspiracies. See, *e. g.*, Booth v. General Dynamics Corp., 264 F.Supp. 465 (N.D.Ill.1967); Collins v. Bolton, 287 F.Supp. 393, 397 (N.D.Ill.1968). Compare City of Chicago v. Allen Bradley Co., 32 F.R.D. 448, 451 (N.D.Ill.1963).

■ Finally, the representative parties[3] will fairly and adequately protect the interests of each class. Having purchased substantial quantities of library books, the named plaintiffs may be expected to pursue the case diligently and thoroughly. Defendants do not question the technical competence of plaintiffs' attorneys. See Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 727–728 (N.D.Cal.1967).

In addition to these prerequisites, F.R.C.P. 23(b) (3) requires that:

"questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [4]

Before analyzing these two factors, however, the opinion will describe more fully the litigation's factual setting. Then, detailed analyses of the common questions and of the superiority of the requested class actions will be made. The next section will consider the distinctive problems presented by the national suit. Finally, various administrative details will be explained.

### I. State-Wide Class Actions

The children's books circulated by public libraries and schools receive harsh physical treatment, with the result that their bindings often deteriorate. In the late 1950's, the publishing industry therefore introduced a library edition with a reinforced binding specifically

2. In its October 1968 transfer to this court, the Judicial Panel found that common questions existed. As admitted by Random House:
"The pending cases indisputedly involve one or more common questions of fact. This conclusion is apparent not only from examination of the pleadings in the cases involved * * *" Brief before the Judicial Panel, p. 2.

3. In the state-wide class actions, the attorneys general are proper representative parties. The states supervise the activities of their subdivisions and contribute a substantial share of the funds used for book purchases. As explained in State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391, 402 (S.D.Iowa 1968):
"The right to be represented here is established by the Federal Rules of Civil Procedure. Limitations on the authority of the Attorney General would more properly be raised when and if he departs from the areas of unquestioned authority to pursue the individual claims of members of the class."
See Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn.1968); Il-

linois v. Brunswick Corp., 32 F.R.D. 453, 458 (N.D.Ill.1963).
The City of Chicago is in a similar position with respect to the Chicago Public Library. Since its interests fully coincide with those of the tax supported libraries in Illinois, it is also appropriately their representative. See City of Chicago v. Allen Bradley Co., 32 F.R.D. 448, 452 (N.D.Ill.1963).
Since the Archbishop and bishops of the Roman Catholic church exercise control over the six dioceses in Ohio, they are proper representatives for the state's parochial schools.

4. The Rule then explains that:
"The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

designed for use by these public institutions. According to the complaints, however, the defendants only quoted "net" prices for the library editions. Regardless of whether a publisher, a wholesaler, or a retail distributor sold the publications, the libraries and schools had no alternative but to pay the same "net" price.[5]

After a Senate investigation into this pricing system, the Justice Department instituted grand jury proceedings in 1966. Although the federal government decided not to seek criminal indictments, it obtained consent judgments in 1967 against eighteen separate publishers, each of whom agreed not to fix prices for the next five years.

### A. Common Questions

The single most important issue is whether the defendants' conspiratorial agreements actually existed. Offering the same facts, all class members will strive to establish a national conspiracy among the publishers.[6]

The Justice Department's civil actions only charged vertical conspiracies. The defendants therefore prophesy that the libraries and schools can only prove conspiracies between each publisher and its wholesalers. Nevertheless, a common core of questions will persist. Having purchased titles from most of the publishers, each class member will need to establish all of these conspiracies in order to be fully compensated. Regardless of which plaintiff presents the evidence, the same facts will establish the defendants' liability.[7] The thousands of purchasers will then be able to recover from whichever publisher-wholesaler combination handled the particular titles that were bought.

Besides the overriding conspiracy question, each class member stands in an identical position with respect to the following issues: (1) whether prices were actually inflated, (2) whether the higher prices resulted from the illegal agreements, (3) whether defendants fraudulently concealed the conspiracies, thus tolling the statute of limitations, and (4) whether library books are "unique" products.[8] See Eisen v. Carlisle and Jacquelin, 391 F.2d 555, 565, 566 (2nd Cir.

5. Allegedly, prices remained artificially high despite variations in the following factors: the purchaser's location, the quantity of library editions bought, and a library's attempt to secure competitive bids.
 Since the business relationship between plaintiffs and defendants is simply that of buyers and sellers, proof of the conspiracy will probably not be complicated by varying methods of purchase.

6. Compare Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 458 (E.D.Pa.1968):
 "The overriding issues have to do with the existence of the alleged conspiracy and the establishment of what the prices should have been. * * * [I]t cannot be seriously suggested that plaintiffs must prove the conspiracy and all its ramifications before being permitted to maintain a class action."

7. "There is present herein a common nucleus of operative facts even though there may be lacking complete identity." Siegel v. Chicken Delight, Inc., 271 F. Supp. 722, 726 (N.D.Cal.1967).

8. The publishers have used the label "uniqueness" to advance two defenses, both of which apply equally to all plaintiffs.
 First, since individual books differ, each is unique. But, the prices for rare art works could be pegged above the competitive level.
 Second, if two publishers produce competing editions of a single publication such as "Huckleberry Finn," variations in the bindings, illustrations, and editing may result in distinct products that sell at varying prices. For example, the president of MacMillan Company declared:
 "Unlike other industries the book publishing business sells thousands of unique products, all of which may vary as to literary content, size, format, art work, etc.
 " * * * In determining the price of a book there are many factors taken into consideration by the publishing industry. These include such factors as author's royalties, size and length of the book, the amount of art work, cost of setting type * * *
 " * * * [P]rice is in no manner based upon a competitor's price since each title that we publish has its own cost structure and is a separate product which

1968); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 458 (E.D.Pa.1968).

The predominance of common questions contrasts sharply with the limited individual issues. Depending on the volume of purchases, each class member will need to establish his own damages. But, as stated in Dolgow v. Anderson, 43 F.R.D. 472, 490 (E.D.N.Y.1968): "The common issues need not be dispositive of the entire litigation." See, e. g., Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42, 45 (S.D.N.Y.1966); Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 684 (N.D.Ind. 1966). Compare Zeigler v. Gibralter Life Ins. Co., 43 F.R.D. 169 (D.S.D. 1967); Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391, 402 (S.D. Iowa 1968).

■ If illegal conspiracies raised prices to noncompetitive levels, the purchasers were affected in the same manner and to the same extent. The common resolution of the preceding pervasive issues may therefore avoid the necessity for the parties' continual relitigation of the questions. Challenged by identical evidence, the defendants need not be subject to judgments which may vary according to the forum in which suit was instituted.

## B. Fair and Efficient Adjudication

Though common questions overshadow individual issues, F.R.C.P. 23(b) (3) requires that a class action also be the superior means of litigation. Since each controversy involves a common core of identical questions, the efficiency of a class action is apparent. See Hohmann v. Packard Instrument Co., 399 F.2d 711, 715 (7th Cir. 1968). In addition, five mutually reinforcing factors demonstrate the superiority of class actions.

First, since many plaintiffs only purchased small quantities of the reinforced editions, most individual class members have little incentive to sue alone. Their financial claims do not justify the expense of complex antitrust litigation, especially in light of the defendants' persistent efforts to prevent document discovery. In Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941), the Seventh Circuit explained:

> "To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent."

Only when the purchases are combined in a class action is the potential damage recovery sufficiently large to warrant litigation. See, e. g., Escott v. Barchris Const. Corp., 340 F.2d 731, 733 (2d Cir. 1965); Advisory Committee's Note, 39 F.R.D. 98, 104 (1966). Compare Gas Service Co. v. Coburn, 389 F.2d 831, 833 (10th Cir. 1968); Kainz v. Anheuser-Busch, Inc., 194 F.2d 737 (7th Cir. 1952).

Second, all class members have had ample opportunity to control their own litigation. Many libraries and schools have commenced individual actions. Moreover, some suits have been pending for over two years, allowing numerous plaintiffs to intervene.[9]

Third, the extensive litigation already commenced illustrates the widespread, but diffuse nature of the injury inflicted upon the public libraries and schools. Recognizing the desirability of concentrating this interwoven, far-flung litigation in a single forum, the Judicial Panel transferred all cases to this Court for consolidated pretrial proceedings. In-

must stand or fall on its own merits." See also School Dist. of Philadelphia v. Harper & Row Publishers, Inc., 267 F. Supp. 1001, 1004 (E.D.Pa.1967). If the demand, content, and prices of individual books is indeed divergent, perhaps the defendants did not conspire to fix prices. But, the resolution of the parties' factual disputes will be accomplished at trial, not now.

9. Furthermore, pursuant to F.R.C.P. 23 (c)(2), individual class members may help shape the litigation by entering an appearance through counsel of their own choosing.

tensifying the concentration, class actions will promote desirable economies of time, effort and expense. For example, plaintiffs will no longer need to file new lawsuits,[10] most of which would eventually be transferred here anyway. See Fischer v. Cletz, 41 F.R.D. 377, 385 (S.D. N.Y.1966); Advisory Committee's Note, 39 F.R.D. 98, 102–103 (1966).

In response, defendants suggest that permissive intervention and joinder is preferable. The recent history of this litigation dramatically illustrates the impracticality of these alternatives. In 1966 there was a single suit purporting to be a class action. The entire litigation might have been concluded without further complexity. But defendants successfully opposed the class suit, with the result that lawsuits have blossomed throughout the country.[11] Rather than the original handful of attorneys, lawyers are now so plentiful that the entire courtroom is filled at each pretrial conference. Section 1407 consolidation became mandatory.[12] When returned for trial, the subsequently filed cases will consume substantial amounts of the transferor courts' time. The prospect of further intervention and joinder, combined with the inevitable proliferation of lawsuits, is inimicable to economical adjudication.

Fourth, the defendants enumerate the "insurmountable" administrative difficulties [13] which may be encountered in

---

10. Although 15 U.S.C. § 16(b)'s one-year suspension of the statute of limitations expired in November 1968, plaintiffs have continued to initiate cases.

The publishers argue that all injured libraries and schools have already joined the litigation because the companies informed purchasers of the 1967 consent judgments. The notice, however, explicitly declared that:

"The judgments do not contain any determination or admission that there was ever any violation of law by any publisher."

The assumption that all potential plaintiffs were aware of their causes of action thus seems dubious.

11. When the class action question was considered about two years ago, the MacMillan Company declared:

"Plaintiffs' brief at page 14 states that an 'inevitable alternative to a class action in this litigation is a multiplicity of suits in forums all over the country.' Such a statement is nothing more than an effort to raise a strawman which does not exist. * * * [T]he Hart Hearings received considerable publicity in the Spring of 1966, and any schools or libraries who desired to bring a claim as a result of those hearings have had ample time to do so."

Defendants' instant arguments sound even more hollow today than they did in 1967.

12. The publishers also assert that section 1407 consolidation is irreconcilably inconsistent with class actions. As illustrated by numerous other section 1407 cases with class actions, these two procedural devices are complementary. Each may achieve efficiencies that the other cannot. Section 1407 simplifies the pretrial stage of litigation, while a class action facilitates the disposition of later aspects of the controversy such as the actual trial.

13. The following passages from the defendants' briefs illustrate these vague hurdles:

"[L]iability could only be established by proof of all the separate commercial facts, relationships, documents, methods, products and transactions linking the particular wholesaler individually with each publisher, as well as with the individual purchaser. It is entirely possible and highly probable that these facts would be different in almost all instances and there is nothing suggesting an assumption to the contrary.

"The permutations and combinations in elements of proof which thus would be necessary in order to establish all the diverse conspiracies linking wholesalers to publishers rise to staggering mathematical proportions."

Furthermore:

"Aside from the expected difficulties of agreeing upon the terms of this notice, the real problem is that of determining who is to receive these notices. Many of the complaints employ such imprecise and vague terms as 'public institutions,' 'political subdivisions,' and 'all public purchasers.' The Court will have to entangle itself in the tremendous problem of giving concrete meaning to these vague phrases * * *."

Finally:

"[T]he identity of the public body or public official entrusted with asserting a

these class actions.[14] Settlement may become more difficult since the expanded number of plaintiffs will each demand compensation. Naturally, the publishers and wholesalers are reluctant to see their liability increase. Even with thousands of class members, however, the imaginative and resourceful attorneys handling these cases can undoubtedly devise workable settlement procedures. For example, a lump sum could be set aside for the plaintiffs in each state; appropriate personnel might then apportion the fund among class members who substantiate their damage claims.[15]

Another practical difficulty might arise if the defendants wanted to direct interrogatories and depositions to each class member. But, no further discovery appears to be necessary. Since defendants' records are relatively complete and accessible, they can prepare full answers to exhibit C (transaction data).[16] Until liability is established,[17] however, it would be wasteful for thousands of plaintiffs to search their files for similar data.[18] To prove their damages, of course, individual class members will eventually be required to establish their specific purchases. See, e. g., Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 684 (N.D.Ind.1966); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42, 45 (S.D.N.Y.1966). Compare F.R.C.P. 23(c)(4) with Advisory Committee's Note, 39 F.R.D. 98, 106 (1966).

Even though the class actions may expand administrative tasks, the benefits to be secured will more than outweigh the additional chores. As recently explained by Judge Becker in Technograph Printed Circuits, Ltd. v. Methode Electronics, 285 F.Supp. 714, 724–725 (N.D. Ill.1968):

> "[T]he difficulties likely to be encountered in the management of a class action are not important when weighed against the benefits to the class * * * and to the administration of justice. * * * To process the pending litigation and most of the remaining active, inactive and the potential litigation by a large number of separate trials would 'raise administrative difficulties far exceeding those present in this class action.'"

Most importantly, the fifth and final factor is the opportunity that class actions will provide for the publishers and wholesalers to receive a full and fair hearing on their defenses. Assuming that they did not conspire to maintain non-competitive prices, the defendants will not be subjected to the expensive ordeal of repeatedly demonstrating their innocence at trial. Nor will they be exposed to as great a threat that subse-

---

claim of this sort apparently varies widely from community to community. Thus it is doubtful that notices from the Court, even if sent, would reach the proper persons.
"Second, the problem of class overlap * * * would present overwhelming difficulties in management * * * [W]e submit that any attempt at 'redefinition' of the Philadelphia class, to avoid conflict with all of these other classes, probably would be impossible, and certainly would be unmanageable."

14. Section III of the opinion will discuss the redefinition of overlapping classes and the details of providing notice under F.R. C.P. 23(c)(2).

15. Apparently, a similar settlement arrangement is presently being considered for the antibiotic drug cases.

16. To avoid the necessity for two complete transaction searches of their files, the defendants will be granted a reasonable extension of time to answer exhibit C.

17. Presumably, the liability and damage issues will be separated for actual trial, with the former determined first.

18. Compare Contract Buyers League v. F & F Investment, No. 69 C 15, N.D. Ill., March 28, 1969, in which Judge Will upheld plaintiffs' class action and required "each of the defendants [to] furnish a list of persons known by them to be negro purchasers from them on installment contracts of used residential real estate in the City of Chicago since January 1, 1952." (p. 19)

quent litigation could produce inconsistent results. Furthermore, in spurious class actions under old F.R.C.P. 23, class members could intervene after a favorable decision on the merits without risking the chance of an adverse judgment.[19] Defendants will not be victimized by such one-sided intervention.

In conclusion, the four prerequisites of F.R.C.P. 23(a) are satisfied by each of the state-wide class actions. Moreover, common questions of law and fact overshadow the damage issue that is peculiar to individual plaintiffs. Besides being the most efficient way to resolve the plaintiffs' widespread claims, class actions will protect the defendants' rights, guaranteeing that they will not be subject to numerous inconsistent judgments scattered throughout the nation.[20]

## II. National Class Action

The School District and City of Philadelphia filed the first lawsuit protesting artificial book prices. Two classes of plaintiffs are designated: (1) all public school systems in the United States with an enrollment of 12,000 students or more, and (2) all state and municipal agencies which maintain libraries for the use of the general public, such libraries having annual book funds in excess of $10,000. Totaling approximately 1324, the class members are listed in an exhibit attached to the complaint.[21] In April 1967 the Philadelphia transferor court ruled that the class action was not proper at that time.[22] Plaintiffs now request reconsideration, maintaining that subsequent developments have sub-

stantially altered the desirability of a class action.

In April 1967, discovery had only begun. The Justice Department's civil actions had just been filed. Thus, one could not determine whether common questions would predominate. Similarly, no related litigation was then pending, and it was impossible to predict whether other libraries and schools would institute suit. Therefore, a class action did not seem to be the superior means of adjudication.

In April 1969, however, the litigation's factual background is more fully known. With the generous benefit of hindsight, subsequent discovery, and the proliferation of lawsuits, the identity and nature of all plaintiffs' claims have become evident. Defendants concede the existence of the "net" pricing system. Harper and Row Publishers responded to interrogatory number 20 as follows:

> "Library editions are sold at net price or at a discount where the sale is to a wholesaler. * * * This method of pricing appears to be similar to the practice prevailing in the book publishing industry."

Although the national action has a broader geographical scope than do the state classes, all of the considerations discussed in the preceding section of this opinion apply fully to the *School District of Philadelphia*. In fact, the wholesalers tacitly admit that the state and the national actions are indistinguishable; without differentiation, their brief considers both motions together. Thus, in the national class, common questions pre-

19. See, *e. g.*, Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 589 (10th Cir. 1961) ; State Wholesale Grocers v. Great Atlantic and Pacific Tea Co., 24 F.R.D. 510, 512–513 (N.D.Ill.1959).

20. Additionally, if the decision to sustain the class actions subsequently appears erroneous, F.R.C.P. 23(c)(1) provides that the order may be altered or amended before decision on the merits.

21. If the named plaintiffs in other suits and the state-wide class members are

eliminated from the national suit, less than one-half of the 1324 specified purchasers remain.

22. "[W]e do not believe, *at this time*, that any questions of law and fact, common to all members, 'predominate' over questions affecting individual members." (Emphasis in the original.)

School Dist. of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001, 1004 (E.D.Pa.1967).

dominate over individual issues,[23] and a class action is superior to other alternatives for the fair and efficient resolution of the plaintiffs' causes of action.

Nevertheless, the publishers highlight the selective composition of the two national classes. Representing only the largest purchasers, the School District and City of Philadelphia provide no redress for the numerical bulk of the nation's libraries and schools. The parties insinuate that the selection of potential plaintiffs was motivated by the Philadelphia attorneys' self-interest.

The desertion of the smaller purchasers is unfortunate. Therefore, if other plaintiffs had sought to represent all aggrieved purchasers, such an action would presumably have prevailed over the Philadelphia class. But this choice is not presented.

To the extent that other class actions do not cover the members of the national class, the Philadelphia suit may be the only relief they can receive. Many claims are too small to justify separate lawsuits, and 15 U.S.C. § 16(b)'s one-year suspension of the statute of limitations has expired. Thus, the only issue is whether the absent class members, allegedly the most seriously overcharged plaintiffs, should be denied recovery merely because smaller libraries and schools will not be compensated.[24] In the interests of justice, the 1324 purchasers deserve a chance to recover their excessive payments.

Moreover, other courts have *sua sponte* limited the size of class actions by deleting the smaller, less aggrieved mem-

bers. See, *e. g.*, Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 462 (E.D.Pa.1968):

"By analogy to concepts of diversity jurisdiction and venue, * * * I consider it appropriate to limit the definition of the class by setting up criteria of size of population served, area, and proximity to this district.

" * * * [T]hese actions may be maintained as class actions on behalf of * * * (3) all cities in the United States having a population * * * in excess of 50,000, and all school districts and public building authorities within such cities."

Furthermore, the singular importance of private treble damage actions in the antitrust field suggests that the size restriction should not defeat the class action. As recently declared by the Supreme Court in Minnesota Mining and Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965):

"Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."

See generally Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 269 F.Supp. 540, 542 (E.D.Pa.1967). Upholding the national class action will facilitate private antitrust litigation and will discourage future conspiracy violations. See Dolgow

23. In fact, the national action contains one pervasive question of law which is absent in the state classes: The Philadelphia plaintiffs' motion for reconsideration was not filed until more than one year after the Justice Department's civil actions were concluded. At some future date, therefore, the court may have to decide whether these class members can take advantage of 15 U.S.C. § 16(b)'s one-year suspension of the statute of limitations

or whether they must rely upon the general four year statute, 15 U.S.C. § 15b.

24. Defendants' objection logically implies that the named plaintiffs should also be disqualified. If a restricted class is arbitrary, the categorical specification of one or two individual plaintiffs is even more arbitrary. Absent members of a class action have as complete a right to sue as the representative parties who bring the suit.

v. Anderson, 43 F.R.D. 472 (E.D.N.Y. 1968).[25]

 In conclusion, the two national classes proposed by the School District and City of Philadelphia meet all the criteria established by F.R.C.P. 23(a) and (b)(3). The class action is the superior method for the fair and efficient adjudication of the controversy. Although the restriction on the classes' scope appears arbitrary, the enumerated members should not be penalized solely because the unrepresented libraries and schools will not receive redress for their overpayments.

*III. Administration of the Class Actions*

 Two administrative questions need to be resolved. The first is how the class members will be notified of the actions. Despite scattered contrary suggestions, most courts and commentators agree that the court need not perform all tasks associated with informing the absent parties.[26] The representative plaintiffs will therefore prepare a mailing list of all members of their classes. Along with the list, plaintiffs shall submit to the court a draft notification letter. If possible, plaintiffs in the various class actions should confer and submit a master letter which can be adapted to the individual classes. Copies of the draft notices shall be furnished to the defendants who will then have ten days in which to make suggestions. To avoid the appearance of claim solicitation,[27] the notices will be mailed by the court

on official stationery. Similarly, class members' replies will be directed to the court.

 The second administrative question concerns the overlap between various class actions. Both the national suit and several state actions include some of the same libraries and schools. Presumably, class members situated in a given state would prefer to be represented by the attorney general of that jurisdiction.[28] One may also assume that named plaintiffs who have instituted their own suits do not want to participate in a larger class suit.[29] Accordingly, notice in the national class action will not be sent to any named plaintiffs nor to any members of other class actions. Unless they voluntarily notify the court to the contrary, these members will not be represented by Philadelphia. As explained in State of Minnesota v. United States Steel Corp., 44 F.R.D. 559, 576 (D.Minn.1968):

> "This over-lap in the court's judgment is best resolved by permitting the maintenance of the * * * [national] suits as class suits only to the extent that absent class members may request entrance to the class if so desired, within the time hereinafter prescribed by the court without, however, there being any notice on behalf of these plaintiffs sent from this court or otherwise * * *"

In New York and Minnesota, both the state's attorney general and a competing plaintiff seek to represent all the li-

---

25. "By making real the threat of exposure and civil liability, the class action also serves to effectuate this [the regulatory statute's] objective." 43 F.R.D. 487.

26. See, *e. g.*, State of Minnesota v. United States Steel Corp., 44 F.R.D. 559, 577 (D.Minn.1968); Contract Buyers League v. F & F Investment, No. 69 C 15, N.D. Ill., March 28, 1969, at 20; Kaplan, 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 387 n. 120 (1967). *Compare* Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 464 (E.D. Pa.1968).

27. See Advisory Committee's Note, 39 F. R.D. 98, 107 (1966).

28. Of course, under F.R.C.P. 23(c)(2), any class member may select either of the two classes and may, if he chooses, retain his own counsel.

29. For example, the City of Hastings, Minnesota, the City of Rochester, New York, and several boards of education in New Jersey intervened in the Philadelphia case, even though the respective states have filed class actions covering these public bodies.

braries and schools in the state. All of the potential representative plaintiffs meet the criteria established by F.R.C.P. 23.[30] To choose between the suits, one might use a first to file rule which would sanction a race to the courthouse. On the other hand, it seems preferable to consider which of the representative parties will most effectively serve the class members.

 Unlike private attorneys, the state attorneys general will apparently not charge a fee. Moreover, the state officials are responsible for protecting their jurisdictions and its subdivisions from fraudulent overcharges.[31] Accordingly, although all of the requested class actions may be so maintained, the absent class members will only be notified of the actions brought by the attorneys general (68 C 2041 and 69 C 48).[32] If class members desire to be represented by Hempstead School District, 68 C 2259, the City of St. Paul, 68 C 2040, or School District #625, 69 C 797, they should so inform the court within the period specified for class members to respond to notices.

*IV. Conclusion*

F.R.C.P. 23(a) specifies four prerequisites for a class action, each of which is easily satisfied. The contentions of the representative plaintiffs are typical of the claims of the numerous class members. Since all purchasers of library editions share an identical position with respect to the crucial issues in the cases, the named plaintiffs will adequately protect the classes' interests.

In both the state-wide and the national class actions, questions of law and fact common to the members of the group predominate over any issues affecting only individual purchasers. Identical facts and evidence will be required to establish the existence and the effect of the alleged price fixing conspiracies. In contrast, the claimants' damage determinations may be easily computed.

Superior to other available means for just and economical resolution of the controversies, class actions will minimize the proliferation of lawsuits which would otherwise result from the alleged pervasive conspiracies. They will also diminish the duplication of judicial effort and attorneys' expense. Furthermore, class actions will relieve the defendants from the burden of defending numerous scattered cases and will reduce the likelihood of inconsistent judgments. Although including only the larger libraries and schools, the national class action provides both a fair and an efficient form of redress for its members.

Finally, the administration of these actions will not pose insurmountable difficulties. In situations where classes overlap, notice will only be sent to the members of one class, thus avoiding the confusion of having duplicate, conflicting communications. After plaintiffs prepare a mailing list and a draft letter, the court will direct individual notice to all members of the various classes who can be identified and located.

Accordingly, I have entered an order today allowing the following plaintiffs to maintain the specified class actions.

30. The challenges to the attorneys general's authority to bring the class actions assume that state law must specifically authorize such action. Under F.R.C.P. 23, however, any plaintiff may act as a representative party so long as it meets the criteria established by subsections (a) and (b)(3). See, *e. g.*, State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391, 401–402 (S.D.Iowa 1968); State of Minnesota v. United States Steel Corp., 44 F.R.D. 559, 577 (D.Minn.1968); Illinois v. Brunswick Co., 32 F.R.D. 453, 458 (N.D.Ill.1963).

31. Furthermore, in Minnesota, the state has a close relationship with libraries and schools through its Department of Education. See 121 Minn.Stats. § 121.11 (1967). Besides direct purchases of books for its state circulatory system, Minnesota supplies about 45% of the funds used by school districts to purchase library books.

32. Named plaintiffs such as New York City presumably do not want to be included in any class action.

| Case No. | Plaintiff | Class |
|---|---|---|
| 67 C 1899 | Illinois | Chicago Board of Education and approximately 1,338 public school districts in Illinois. |
| 68 C 1835 | Texas | Approximately 1,232 public school districts and 354 tax supported libraries in Texas. |
| 68 C 1999 | Kansas | Approximately 330 public school districts and 272 tax supported libraries in Kansas. |
| 68 C 2014 | Wisconsin | Approximately 572 public school districts and 320 tax supported libraries in Wisconsin. |
| 68 C 2041 | Minnesota | Approximately 500 public school districts and tax supported libraries in Minnesota. |
| 68 C 2144 | School District and City of Philadelphia | Two national classes: (1) public school systems, and (2) public libraries. See "Amendment to paragraph 4 of the amended complaint," filed 3/6/67. |
| 68 C 2257 | Indiana | Approximately 354 public school corporations and 242 tax supported libraries in Indiana. |
| 68 C 2258 | Ohio | Approximately 656 public school districts and 258 tax supported libraries in Ohio. |
| 68 C 2302 | City of Chicago | Chicago Public Library and approximately 498 tax supported libraries in Illinois. |
| 68 C 2303 | Archbishop and Bishops of Ohio | Approximately 776 diocesan and non-diocesan Catholic schools in Ohio. |
| 69 C 48 | New York | Public school districts and tax supported libraries in New York. |
| 68 C 2259 | Hempstead School District | Named plaintiffs and public purchasers in New York who request inclusion. |
| 68 C 2040 | City of St. Paul | Public and private purchasers in Minnesota who request inclusion. |
| 69 C 797 | School District # 625 | Public purchasers in Minnesota who request inclusion. |