CITY OF NEW YORK, for itself and all
other persons similarly situated,
Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

No. 72 Civ. 4213.

United States District Court,
S. D. New York.

Aug. 9, 1973.

See also, D.C., 357 F.Supp. 327.

Corp. Counsel of City of New York for plaintiff; Norman Redlich, Corp. Counsel, New York City, Evan Davis, Asst. Corp. Counsel, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for plaintiff; George D. Reycraft, and Terence F. Gilheany, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant; Bruce Bromley, Paul M. Dodyk, V. Thomas Fryman, Jr., New York City, of counsel.

ROBERT L. CARTER, District Judge.

## OPINION

The City of New York has moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure and Rule 11A of the Local Rules of this court, for leave to proceed on behalf of all non-federal governmental units and instrumentalities in the United States which have purchased or have contributed to the purchase of city buses or bus parts, as defined in paragraph 6 of the complaint, during the period covered by this action. General Motors has moved to have George Reycraft, Esq. disqualified from representing the City on the ground that such representation is in violation of the Code of Professional Responsibility.

## I.

### The Motion for Class Action Determination [1]

■ Counsel for the City of New York have represented, on the basis of their discovery to date, that the class plaintiff seeks to represent includes between 200 and 300 non-federal governmental units and instrumentalities and that its membership is readily and precisely determinable. A preliminary list of 177 class members has been provided to the court and is attached hereto as an Appendix. The City has agreed to bear the cost of direct notice to each member of the class.

It is apparent that there are common questions of law and fact and that the

[1]. Rule 23(a) lists the following prerequisites to the maintenance of a class action:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims . . . of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

size of the class warrants a finding that joinder is impractical.[2] Moreover, the court has no reason to doubt that the City of New York can and will provide fair and adequate representation to the other members of the class. Fed.R.Civ. P., Rule 23(a)(1), (2) and (4).

The defendant contends that differences among the class members regarding the manner of purchase and payment; the effect of the alleged monopolization upon physical, economic, environmental and sociological conditions; design specifications and the amounts paid make class action treatment inappropriate in this case. These factors at first blush, seem supportive of the defendant's contention, but on full consideration it becomes clear that each of these local differentiations relates solely or primarily to the question of damages and will be of little or no relevance in determining plaintiff's underlying claims.

The complaint alleges an unlawful, nationwide monopoly which operates to the detriment of every public body providing or financing bus systems in the United States. Should plaintiff succeed in proving that common claim, the complications which might arise by virtue of differences in the nature and extent of damages can be minimized by the establishment of separate proceedings to determine damages or by the determination of formulae for the assessment of damages sustained by various members of the class. Should plaintiff fail to prove its underlying claims, defendant would be spared relitigation of those issues by similarly situated potential plaintiffs. It is my judgment, therefore, that the claims of the City of New York are typical of those of the class and that class action treatment is permissible. Fed.R.Civ.P. 23(a)(3). Philadelphia Electric Company et al v. Anaconda American Brass Company, 43 F.

R.D. 452 (E.D.Pa.1968); State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968).

Defendant has argued that class action litigation is less appropriate in cases which allege monopolization than in cases which allege a conspiracy to fix prices. Although a monopoly has been charged, there is nothing in the complaint which would suggest that we are dealing with anything less than a national market. Indeed, the City of New York has represented that "General Motors [was] at the time of filing [of] this complaint the only company which manufacture[d] new buses in the United States and [was] the principal, if not sole, supplier to the few other companies which assemble new buses in the United States from parts manufactured by others" (Complaint, ¶ 11). Under these circumstances, it does not appear that an action on behalf of a national class is in any way inappropriate or that the claim of the plaintiff regarding the alleged monopolization is atypical. The possibility of establishing such subclasses as the facts may warrant is not, however, precluded. Fed.R.Civ.P., Rule 23(c)(4).

Rule 23(b)(3) provides that where the requirements of subdivision (a) have been met, class action status may be conferred if

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

It is my view that the common underlying issue of liability pursuant to an unlawful, nationwide monopoly predominates over any questions as to the varying nature or amount of damages.

---

**2.** It does not appear, on the other hand, that the class membership is so large as to make a class action unmanageable.

The next consideration is assessment of the superiority of the class action as a means of resolving this controversy. Defendant has urged that this determination cannot properly be made until such time as suits are filed by other class members, arguing that class action status should not be conferred unless and until a number of members of the class manifest a definite and serious interest in litigating their claims. It is, however, inconceivable that other governmental units will not pursue such claims in the event that the class action motion is denied and the suit brought by the City of New York is, or appears likely to be, successful.

In this regard, the lesson of State of Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969), is instructive. That case involved antitrust actions by various state and local government units to recover damages for the artificial inflation of the price of children's library books. In 1969 the court ordered that the litigation proceed as a national class action after noting that:

> In 1966 there was a single suit purporting to be a class action. The entire litigation might have been concluded without further complexity. But defendants successfully opposed the class suit, with the result that lawsuits have blossomed throughout the country. Rather than the original handful of attorneys, lawyers are now so plentiful that the entire courtroom is filled at each pretrial conference. Section 1407 consolidation became mandatory. When returned for trial, the subsequently filed cases will consume substantial amounts of the transferor courts' time. The prospect of further intervention and joinder, combined with the inevitable proliferation of lawsuits, is inimicable to economical adjudication. 301 F.Supp. at p. 490.

Defendant's remaining contention that Rule 23 treatment is only appropriate where the proposed class members are incapable of pursuing the litigation independently is without merit. The 1966 Advisory Committee's Note to amend Rule 23 sets forth the following guiding considerations for review of a class action application made pursuant to subsection (b)(3):

> The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical: the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. 39 F.R.D. 98 (1966) at p. 104.

There is, however, nothing in the language of the Rule itself or in the Committee's commentary which suggests that the impracticality of separate litigation or the inability of the class members to press their claims individually is requisite to the maintenance of a class action. The facilitation of litigation by small claimants with inadequate means is, of course, one of the aims and benefits, but it is not the sole purpose of Rule 23.

The City of New York has initiated a suit which seeks to present a substantial and obviously attractive cause of action on behalf of a large number of public bodies which vary in size and in the ability to conduct major litigation. It has demonstrated its willingness and capability to pursue that action effectively. Discovery is proceeding expeditiously. Prompt determination of the underlying issue of liability within the context of this initial litigation seems the fairer and more efficient way of proceeding.

## II.

### *The Motion For Disqualification of Counsel*

Defendant contends that Mr. Reycraft's prior participation as an attorney for the Department of Justice in an allegedly similar matter renders his involvement in this action as counsel for the City of New York violative of Canon 9, A.B.A. Code of Professional Responsibility.[3] In seeking the removal of plaintiff's counsel, the defendant is requesting extraordinary relief, the implications of which penetrate to the heart of our adversary system. The unfettered right to the selection of counsel of one's own choosing is an essential feature of our legal system, and interference by the courts with the choice made is justified only when necessary to maintain the integrity of the rule of law and public confidence in the fair administration of justice. The court's responsibility in this instance, therefore, is to seek to perform what is at times a discreet task of allowing full exercise of a client's right to choose his own counsel without permitting deviation from ethical standards of professional conduct. *Emle Industries, Inc. v. Patentex*, 478 F.2d 562 (2d Cir. decided May 9, 1973).

### *Mr. Reycraft's Role As Government Counsel In Matters Involving General Motors*

In Mid-1954 Mr. Reycraft became associated with the Antitrust Division of the Department of Justice as a trial attorney in the General Litigation Section. Almost immediately he was assigned to work on an investigation to determine whether General Motors was guilty of any illegal monopolization in respect of that aspect of its business operations relating to buses. Ultimately, a complaint was filed in Michigan—*United States v. General Motors* (No. 15816 E.D.Mich. 1956)—which Reycraft "signed and in the preparation of which [he] participated substantially." Affidavit of George D. Reycraft, sworn to on June 18, 1973 at ¶ 3. Reycraft worked on the case from 1954 to 1957 as a staff attorney[4] and then from 1957–1958 as

---

3. This court is not specifically empowered to enforce conformance with the Code. However, the rules do provide that an attorney seeking admission to the Southern District of New York must state "that he has read the Canons of Ethics of The American Bar Association, and will faithfully adhere thereto." (Rule 3(a), General Rules of the Southern District.) Furthermore, "Conduct violative of the Code of Professional Responsibility of The American Bar Association" may subject an attorney to disbarment, suspension or censure. (Rule 5(f), General Rules of the Southern District.) The inherent power of this court to take appropriate action in order to maintain the highest standards of professional ethics has not been challenged, and it is, therefore, not now necessary to delineate the extent to which the court, in the exercise of its discretion, may go to enforce conformance with the code.

4. From January 1955 to March 1956 the Assistant Chief of the Litigation Section was a Mr. George Derr. According to Reycraft, Derr "directly supervised me in an investigation of all of the Antitrust Division files relating to the automotive industry, and of General Motors in particular" in response to a Senate request for information and Derr "had access to all information available to the General Litigation Section relating to litigation being conducted by that Section, including the 1956 *Bus* case." Reycraft Affidavit at ¶ 17. Derr is now employed in the General Counsel's office at G.M.

Derr, in a responding affidavit, claims that "[a]t no time was I ever assigned to, nor did I participate in the Department of Justice *Bus* case against General Motors. In fact, a few days after the case was filed I spoke with Mr. Henry M. Hogan, then General Counsel of General Motors, and requested that I be excused from any assignment involving the *Bus* case because it was a matter that had been pending in the General Litigation Section during the time I was Assistant Section Chief. I wanted to avoid any appearance of impropriety even though I did not participate in the preparation of the case for the Government. The General Counsel was in complete agreement with my position." Affidavit of George L. Derr, sworn to June 21, 1973 at ¶ 5.

Assistant Chief of the General Litigation Section. At no time was he in charge of the litigation; chief counsel throughout the case was Walter D. Murphy.

In 1958 Reycraft became Chief of the Special Trial Section of the Antitrust Division, and from 1958 to 1961, while serving in that capacity, Reycraft alleges that he "no longer had any direct or indirect involvement with the 1956 *Bus* case." Reycraft Affidavit at ¶ 4. However, in 1961 he was promoted to the position of Chief of Section Operations, the third highest position in the Division, and in that capacity "had technical responsibility for all matters within the Washington office of the Antitrust Division, including the 1956 *Bus* case." *Id*. Reycraft claims to have "no recollection of any active participation on [his] part in the 1956 *Bus* case from 1958 through the time [he] departed from the Antitrust Division in December of 1962." *Id*.

In 1959 the Department of Justice initiated a grand jury investigation of General Motors' Electromotive Division (locomotives) which ultimately led to the return of an indictment against General Motors in April 1961. Reycraft, as Chief of the Special Trial Section of the Antitrust Division, was actively in charge of that investigation.

The defendant contends that in addition to investigating locomotives (which investigation is admittedly irrelevant to this action), the jury sought and received evidence pertinent to the then pending *Bus* action and the present controversy. Defendant points to a subpoena duces tecum issued on September 11, 1959 and initiated by Reycraft which calls for, among other things, the production of documents pertaining to all aspects of the manufacture, sale, distribution and pricing of diesel engines[5] and information relevant to certain financing arrangements initiated by General Motors to foster the sale of diesel engines. Both diesel engines and the antitrust consequences of General Motors' financing arrangements have been made subjects of litigation in this action.[6]

In 1961 Mr. Aloysius Power, General Counsel of General Motors, listed in a letter to Reycraft all of the people who had searched General Motors' records in order to comply with the grand jury subpoenas issued in the Electromotive Division investigation. Affidavit of Mr. Bruce Bromley, sworn to on July 2, 1973, Exhibit 2. According to that letter eleven General Motors employees searched the files of the G.M.C. Truck & Coach Division which manufactures buses.[7]

5. The subpoena repeatedly refers to "motor vehicles, diesel locomotives, or diesel engines." A motor vehicle is defined as including "automobiles and highway trucks" and their parts and accessories, thus excluding buses. Diesel locomotives "includes parts and accessories therefor, and maintenance, service repair or rebuilding of diesel locomotives, parts and accessories . . . ." Finally, diesel engine is defined only as including all parts and accessories. One gets the impression that the diesel engines for which information is sought were the engines used in diesel locomotives only (as opposed to diesel engines used for buses) but such limitation is not made explicit.

6. Plaintiff alleges in its complaint:
    ¶ 22. Pursuant to and in effectuation of the aforesaid attempt to monopolize . . ., the defendant directly and through its subsidiaries has done, among other things, the following:
    *        *        *        *        *
    (h) Offered to finance and financed the sale of buses on terms which General Motors' competitors with more limited resources have been unable to meet.
    (j) Refused to sell to other bus manufacturing companies, . . ., various parts, including automatic transmissions and diesel engines, for use in the manufacture of buses.

7. It is unclear whether the G.M.C. Truck & Coach Division manufactures only buses but its name would indicate involvement in the truck manufacturing business as well. Trucks are specifically included as a subject matter of the subpoena under the definition

In response to General Motors' assertions pertaining to the scope of the grand jury investigation the City has produced the affidavit of Mr. Sanford Litvach, an attorney who was associated with the Special Trial Section of the Antitrust Division from mid-1959 to mid-1961. Litvack, who claims to have been actively involved in the grand jury investigation, states that "[t]he grand jury never sought and never received any information which related in any way to the government's pending civil action against General Motors with respect to alleged practices in the manufacture and sale of buses." Affidavit of Mr. Sanford M. Litvack, sworn to on June 27, 1973 at ¶ 3. This statement, however, does not completely answer the defendant's more limited assertions that information was sought and received relevant to diesel engines and financing arrangements both of which are subjects of this action.

Reycraft has asserted that General Motors failed to move for a protective order against disclosure to the grand jury concerning matters involved in the 1956 *Bus* case:

> It was perfectly obvious then, as well as now, that if Mr. Bromley believed that the grand jury inquired into matters which were involved in pending civil litigation, General Motors would have promptly brought the matter to the attention of the court in which the civil case was pending and would have been entitled to relief against any such abuse of the grand jury process.

It appears, however, that General Motors did in fact what Mr. Reycraft indicates Mr. Bromley was entitled to do to prevent abuse of the grand jury process. Mr. Walter Murphy, Chief Counsel for the government in the 1956 *Bus* case, has submitted an affidavit pertaining to certain attempts by the government to obtain information revealed to the grand jury (this incident discussed *infra.*). Mr. Murphy states: "Judge Cashin [of the Southern District of New York] had previously entered a protective order with respect to all the financial data produced by General Motors pursuant to the grand jury subpoena." Affidavit of Mr. Walter D. Murphy, sworn to on June 26, 1973 ("Murphy Affidavit") at ¶ 6.

Finally, in respect of the grand jury investigation, Mr. Bromley, in his affidavit in support of defendant's motion and later at oral argument, has attempted to establish a connection between Reycraft and the 1956 *Bus* action as late as 1962 by pointing to an "affidavit of Mr. Reycraft, sworn to on May 15, 1961, [which] was attached to the application to this court for permission to release General Motors' financial and accounting manuals from the secrecy of grand jury proceedings for use in the 1956 *Bus* action." Affidavit of Bruce Bromley, sworn to on May 31, 1973 at ¶ 17.

In fact, however, the 1961 Reycraft affidavit was submitted in support of a motion to release certain documents obtained by the grand jury for use in the Northern District of Ohio in connection with another case against General Motors but pertaining to the acquisition of Euclid Machinery Co. (earthmoving equipment).

Judge Palmieri apparently did not permit the documents' release but did make Reycraft's affidavit, which generally described the nature of the financial records kept by General Motors, available to the government attorneys in the Ohio action. As Reycraft points out, the mere fact that Department of Justice attorneys needed and sought court permission to discover the contents of another Department of Justice attorney's affidavit is a demonstration of the

---

of "motor vehicle", see Note 5, *supra*, and, therefore, a search of this Division's records may have occurred in order to collect information pertaining to trucks and not buses.

extent to which information within the Department was restricted to attorneys assigned to each particular case.

Mr. Murphy, the chief counsel of the 1956 *Bus* action, reveals by affidavit that application was made in the Southern District "for an order permitting the attorneys conducting [the grand jury] investigation to make available to members of the Antitrust Division's General Motors bus staff certain financial and accounting manuals of General Motors obtained in the grand jury investigation." Murphy Affidavit at ¶ 6. The affidavit in support of this motion was made by Mr. Paul Owens, who at the time was in charge of the grand jury investigation. The application was denied.[8] It is established, then, that two different sets of Justice Department attorneys sought court orders to obtain grand jury documents, and the suggestion is raised that these may not have been available through normal discovery processes.

### *Applicability of Canon 9*

■ Canon 9 of the Code of Professional Responsibility, and the relevant "Ethical Consideration" and "Disciplinary Rule"[9] upon which the defendant bases its motion for disqualification provide:

8. The confusion over these applications may have arisen because Mr. Murphy, in support of his motion decided by Judge Cashin to release grand jury information to the attorneys in the *Bus* case, cited as precedent (and may have even included as an exhibit) the earlier release of the Reycraft affidavit to the attorneys in the Ohio action.

9. The Preliminary Statement of the Code provides:
"The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. They embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived.

### *"Canon 9*

### *A Lawyer Should Avoid Even the Appearance of Professional Impropriety*

#### Ethical Considerations

\* \* \* \* \* \*

"EC 9–3 After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists.

\* \* \* \* \* \*

#### Disciplinary Rules

"DR 9–101 Avoiding Even the Appearance of Impropriety.

\* \* \* \* \* \*

(B) A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

No specific impropriety or prejudice need be shown to prove a violation of these provisions. See, *e. g.*, United States v. Trafficante, 328 F.2d 117, 120 (5th Cir. 1964); Hilo Metals Co. v. Learner Co., 258 F.Supp. 23, 26 (D.Hawaii 1966). The "Ethical Considerations" give substance to the Canon by

"The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.

"The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. . . . An enforcing agency, in applying the Disciplinary Rules, may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations."

describing some of those practices which do in fact *appear* improper. In regard to the fact situation in this case E.C. 9–3 states that "to accept employment [in connection with any matter in which the lawyer had substantial responsibility prior to leaving public office] would give the appearance of impropriety even if none exists."

▇ The Canon, however, is clearly addressed to "private employment" and has, in my judgment, no relevance to the instant situation. Mr. Reycraft's role as counsel for the City of New York cannot be regarded as "private employment".[10] He has not changed sides. First, as counsel for the federal government, and now as counsel for the City of New York, he was and is pressing the claims of entities against General Motors. The mere fact of Reycraft's representation of both the United States and the City of New York in litigation against General Motors does not in and of itself give the appearance of impropriety.

Here that conclusion is strongly undergirded in that there is nothing antithetical in the postures of the two governments in the actions in question, and the legal theories which Mr. Reycraft asserted as attorney for the United States and asserts here as counsel for the City of New York are consonant one with the other. Therefore, since the basic thrust of Canon 9 is to bar former government employees from subsequently accepting employment in the same cause on behalf of private parties, and since Mr. Reycraft's employment as counsel for the City of New York is in no way antagonistic to the position taken in the prior litigation or adverse to any interest of the United States, no showing of the appearance of impropriety has been made.[11]

▇ Although the inapplicability of Canon 9 is established by the fact that Mr. Reycraft's employment in this matter is not private, denial of defendant's motion can be predicated upon the additional ground that the litigation now before this court is not the same "matter" with which Mr. Reycraft was involved during his employment with the Justice Department.

The 1956 action was a civil suit against General Motors alleging that it had monopolized the manufacture and sale of buses in violation of Section 2 of the Sherman Act. That claim constitutes one aspect of the case now pending.[12]

10. There is a fee arrangement between the City and Mr. Reycraft by which, if the City should prevail, he stands to gain very substantial remuneration. However, the fact or size of his fee for services seems totally irrelevant to the basic issue raised here.

11. Mr. Reycraft fully advised the Department of Justice of his participation in this action and the facts of his prior association with the Department prior to agreeing to act as counsel in this case. Reycraft affidavit, Exhibit B, Letter to Mr. Thomas E. Kauper, Assistant Attorney General, Antitrust Division, Department of Justice, from Mr. George D. Reycraft, dated August 4, 1972. In response, Mr. Leon Ulman referred to two federal conflict of interest laws: 18 U.S.C. § 207(a) which prohibits a former United States employee from *ever* acting as attorney for anyone other than the United States in a matter in which the United States is a party *and* in which he participated "personally and substantially" while in the government employ; and 18 U.

S.C. § 207(b) which bars, *for one year*, a former United States employee from acting as attorney in connection with any matter which was within his "official responsibilities" during the year preceding the termination of his government service.

The Ulman letter concludes by noting that § 207(b) clearly has no application and as to § 207(a) "the United States will not be a party to or have a direct and substantial interest in the private antitrust suit by the City of New York against General Motors. Therefore, section 207(a) has no application." Reycraft affidavit, Exhibit C, Letter to Mr. George D. Reycraft, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, Department of Justice, dated October 12, 1972.

12. The complaint in this case also alleges that the defendant violated Section 7 of the Clayton Act. This claim was not made by the government in the 1956 case and it is thus clearly a new "matter".

The complaint alleges that General Motors not only has monopoly power but has exercised that power within the last few years.[13] The relevant statute of limitations, 15 U.S.C. § 15b, provides that "any action [for violation of the antitrust laws] shall be forever barred unless commenced within four years after the cause of action accrued . . . ." Therefore, while it is not necessary to decide now the extent to which plaintiff will be permitted to delve into matters of the more distant past, either by discovery or at trial, it is clear that only recent violations of the law will be sufficient to sustain its cause of action. Plaintiff, understanding this burden, asserts:

"The evidence will show that notwithstanding the Consent Decree [terminating the 1956 action], General Motors continues to hold monopoly power in the transit bus industry. It is expected that the major part of the City's case will consist of proof of events and practices occurring during the past ten years." Reycraft Affidavit at ¶ 14.

In Control Data Corp. v. International Business Machines Corp., 318 F.Supp. 145 (D.Minn.1970), the plaintiff's attorney had previously worked on a suit against IBM while he was with the Department of Justice. That earlier suit ended in a consent judgment entered in 1956. The court gave five reasons for denying the motion to disqualify the plaintiff's attorney: (1) the attorney's service with the Department had ended 15 years ago; (2) the subject of the earlier suit was tabulating machines while the later suit involved computers;

(3) the computer industry had changed so extensively that any information still retained by the attorney could not be of any value; (4) any information he had would be irrelevant and immaterial; and (5) the *present* illegal acts were not "investigated or passed upon"[14] in the earlier action.

All of the factors which led the *Control Data* court to deny the motion to disqualify, save, perhaps, the drastic change in the industry, are present and compel the same conclusion here.

In determining whether this case involves the same matter as the 1956 *Bus* case, the most important consideration is not whether the two actions rely for their foundation upon the same section of the law, but whether the facts necessary to support the two claims are sufficiently similar. I conclude that they are not.

As to the grand jury investigation, there is some conflict, but it is clear that the grand jury's concern was with locomotives and not with buses or bus parts. While there may have been some overlapping in information obtained through discovery in the *Bus* case and that secured by the grand jury, the thrust and purpose of that investigation are remote from this action. Therefore, even if Canon 9 were considered applicable, it would not bar Reycraft's representing plaintiff in this cause on the basis of the appearance of impropriety.

■ That, however, does not end the matter. In determining the propriety or impropriety of Mr. Reycraft's engagement by the City of New York it is, in my judgment, appropriate for the court to determine not only the applicability

---

13. Indeed, General Motors fully recognizes this fact as evidenced by its objection to certain allegedly overbroad discovery requests of plaintiff. "Briefly stated under its monopolization charge, the plaintiff must show not only the power to exclude competition and the power to control prices but it must also show the exercise of that power in its impact on plaintiff within the period of the statute of limitations."

14. At that time the ABA Canons of Professional Ethics provided in Canon 36:

"A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."

of Canon 9, but also whether he obtained, in his capacity as United States counsel in the 1956 *Bus* action and in the grand jury investigation, information as to defendant's operations which is arguably privileged and would not have been available to counsel for any party other than the United States. It is not enough for defendant to show that he may have gained some expertise and skill in respect of the handling of the current litigation. What must be shown is that he gained in skill or knowledge that which would not have been possible for counsel for New York to obtain on their own. A case for that conclusion has not been made.

Certainly, he learned nothing in the 1956 *Bus* action that counsel for the City could not have obtained. Barring, of course, restrictions in respect of time limitations or permissible discovery which the statute of limitations may mandate in this action, there is no indication that Reycraft, as Department of Justice attorney, could go further into General Motors' affairs than he will be able to do as counsel in this action.

Furthermore, as far as I can ascertain, he was not able, as attorney in charge of the grand jury investigation, to exceed the limits of permissible discovery in this action. While there is some confusion as to what was involved in the grand jury investigation, defendant has not made a showing that any privileged information was gained by Reycraft in the course of that investigation. There has thus been no showing of prejudice or disadvantage to defendant in respect of the present litigation by virtue of the fact that Reycraft represented the United States in proceedings against General Motors some 10–11 years ago.

### ORDER

The City of New York is granted leave to proceed on behalf of all non-federal governmental units and instrumentalities in the United States which have purchased or have contributed to the purchase of city buses and bus parts during the period covered by the complaint. The parties are directed to submit proposed notices to the class within thirty days of the date of this order. The motion to disqualify Mr. Reycraft is denied.

So ordered.